Thomas J. WITCRAFT and Jill Witcraft, Appellees,

v.

SUNDSTRAND HEALTH AND DISABILITY GROUP BENEFIT PLAN, Appellant.

No. 87-49.

Supreme Court of Iowa.

March 16, 1988.

Frank B. Harty of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, for appellant.

Thomas J. Witcraft and Jill Witcraft, pro se.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

In this single-issue appeal we must decide whether the terms of a health insurance plan cover the treatment of a husband and wife for infertility. The district court, disagreeing with the small claims magistrate, held that the broad definition of "ill-

ness" in the plan, coupled with the absence of a specific exclusion of infertility treatments, indicated that such treatments are indeed covered. Because we think the district court was correct, we affirm.

The claim in dispute here arose because Thomas and Jill Witcraft had had difficulty conceiving a child. Medical examinations showed that Jill was subject to irregular ovulation and that Thomas had a low sperm count and low sperm motility. The Witcrafts obtained infertility treatment and subsequently had a child.

Desiring another child, the Witcrafts sought further treatment. A simple and inexpensive insemination procedure was performed but was unsuccessful. This and the previous infertility treatments were paid for under the health and disability group benefit plan of Thomas's employer, the Sundstrand Corporation. Both Thomas and Jill were covered by this plan.

Because the last treatment had failed, the Witcrafts' physician suggested a more complex and expensive procedure as their "only option." This procedure, called Protocol I, involved treating Thomas's sperm to improve its motility before performing the insemination on Jill. After undergoing this procedure, the couple submitted a claim to Sundstrand for the cost of it.

Sundstrand denied the claim through its appeal review committee, citing article VI, section 6.7 of its comprehensive care and disability plan, which provides:

If a covered individual incurs outpatient expenses relating to injury or illness, those expenses charged, including but not limited to, office calls and for diagnostic services such as laboratory, x-ray, electrocardiography, therapy or injections, are covered expenses under the provisions of [the plan].

Under section 2.24 of the plan, "illness" is defined as "any sickness occurring to a covered individual which does not arise out of or in the course of employment for wage or profit." Sundstrand's reason for denying the Witcrafts' claim was that "the medical services were not performed because of an illness or injury of the patient,

Jill Witcraft, as required under article VI, section 6.7 of the plan."

The Witcrafts then brought a small claims action to recover the costs of the sperm treatment and insemination. The magistrate in that proceeding found that the absence of pregnancy is not an "illness" under the plan's coverage and dismissed the case.

On appeal the district court reversed. The court found that the dysfunctioning of the reproductive organs of both Mr. and Mrs. Witcraft came within the plan's definition of an "illness." The court concluded that because infertility treatments are not among the specific exclusions of the plan, the Witcrafts' treatment is covered by the plan as related to an illness. The court awarded Thomas Witcraft eighty percent of the treatment's cost, which was the percentage provided for under the plan, plus interest.[1]

We then granted Sundstrand's application for discretionary review, *see* Iowa R.App.P. 201, 202, and are now asked to reverse the district court's decision. Sundstrand asserts that the district court incorrectly interpreted "illness" to include nonpregnancy.

In their pro se submission, the Witcrafts contend, in effect, that the district court was correct in characterizing their problem as a coverable "illness" because they, both individually and jointly, have a disorder that could only be treated with the particular procedure they underwent.

I. In an appeal from a small claims action, the district court conducts a de novo review on the record before the magistrate. *See Sunset Mobile Home Park v. Parsons*, 324 N.W.2d 452, 454 (Iowa 1982); Iowa Code § 631.13(4) (1987). Because the underlying action here is one at law for damages, we review the district court's decision to correct errors of law. *Ravreby v. United Airlines, Inc.*, 293 N.W.2d 260, 262 (Iowa 1980); Iowa R.App.P. 4. The findings of the district court have the force of a jury verdict and are binding if supported by substantial evidence. *Ravreby*, 293 N.W.2d at 262. Evidence is substantial if a reasonable mind would accept it as adequate to support a conclusion. *Id.*

II. Simply put, the question here is whether the district court correctly determined that the expense for the Protocol I procedure is covered under the plan. In its letter of denial to the Witcrafts, Sundstrand succinctly stated that "the medical services were not performed because of an illness or injury of the patient, Jill Witcraft" as required by the plan under the previously cited article VI, section 6.7. Sundstrand's representative took this same tack before the magistrate. He testified that the condition of nonpregnancy is not an illness and that, therefore, artificial insemination to change that condition is not treatment of an illness. Thus, the controversy centers on the meaning of the word "illness."

Determining the meaning of words used in an insurance policy is a question for the court to decide, unless the process depends upon extrinsic evidence. *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 107–08 (Iowa 1981). Because no extrinsic evidence was introduced bearing on the meaning of the word "illness," its meaning was a question of law for the district court. *See id.* at 108. The district court's determination, however, is not binding on appeal. *Id.* Thus, we turn to the task of determining what "illness" means in the context of the entire plan. *See Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970).

Article II of the plan contains definitions of words used in it. Section 2.24 of the article broadly defines "illness" as "any sickness occurring to the covered individual which does not arise out of or in the course of employment for wage or profit." It is undisputed that Thomas and Jill are covered individuals. And there is no issue regarding the language "which does not arise

---

**1.** The court noted the plan required that recovery be had by the covered employee, Mr. Witcraft, for items that are compensable. Accordingly, the court entered judgment in favor of Thomas in the amount of $572 and dismissed Jill as a party. The Witcrafts do not challenge the dismissal in this appeal.

out of or in the course of employment for wages or profit."

■ The terms "illness," "sickness," and "disease" as used in health insurance policies are synonymous. *See American Life Ins. Co. v. Stone*, 78 Ga.App. 98, 101, 50 S.E.2d 231, 234 (1948). The dictionary likewise considers the three terms to be synonymous. For example, "illness" includes "sickness," *Webster's New Collegiate Dictionary* 570 (1976), and "sickness" includes "disease," *id.* at 1077.

In the context of health insurance policies, the word "disease" has been defined as a "morbid condition of the body, a deviation from the healthy or normal condition of any of the functions or tissues of the body." 45 C.J.S. *Insurance* § 893, at 969 (1946); *accord Beggs v. Pacific Mut. Ins. Co.*, 171 Ga.App. 204, 205, 318 S.E.2d 836, 837 (1984) (congenital defect of insured's child requiring correction by means of soft palate operation was a "disease" within meaning of group health policy); *Aetna Life Ins. Co. v. Sanders*, 127 Ga.App. 352, 355–56, 193 S.E.2d 173, 175–76 (1972) (obesity requiring operation is a "disease" within meaning of group surgical hospital and major medical expenses); *Webster's* at 327. *See generally*, Annotation, *What Conditions Constitute "Disease" Within Terms of Life, Accident, Disability, or Hospitalization Insurance Policy*, 61 A.L.R.3d 822 (1975).

■ Given the broad approach the plan takes as to the term "illness," we think it is reasonable to ascribe the above definition of "disease" to it. The district court, utilizing dictionary meanings, likewise concluded that the three terms are synonymous and gave substantially the same meaning to the term "disease" as we have. Our approach to determining the definition of the term "illness" is in accord with our rule that insurance policies are construed in the light most favorable to the insured. *See Johnson v. Fireman's Fund Ins. Co.*, 272 N.W.2d 870, 873 (Iowa 1978).

Apparently Sundstrand and the magistrate have no quarrel with the definition. The magistrate determined that

although improper function of ovaries or testicles may be an illness, the condition of being not pregnant is not an illness. Therefore, any procedure i.e. artificial insemination used to change that condition is not compensable under the terms of the plan.

The court finds then as apparently the defendant also viewed those procedures etc. to induce proper functioning of the reproductive systems of the plaintiff and his wife were generally compensable as diagnostic services or other therapy under Article VI, Section 6.7 out-patient physician services.

However, the artificial insemination process does not encourage healing or reverse the malfunction of the genitalia of the parties. Therefore the insemination process is not, according to the terms of the plan, a covered expense.

(Emphasis added.) Moreover, Sundstrand's representative testified that had corrective surgery or treatment been performed on Thomas, it would have been covered. Likewise, if Jill had been treated for her erratic ovulation, the plan would have paid for such treatment. But, according to the witness, procedures such as artificial insemination performed on a healthy individual are not treatment of an illness.

■ Thus, the fighting issue, as gleaned from the magistrate's findings stated above, as well as from the parties' contentions, is whether infertility as experienced by this couple is an illness within the meaning of the plan. The district court thought so and so do we. The district court's well-reasoned response to this issue on appeal is amply supported by the evidence and is legally sound:

The defendant urges, and the magistrate agreed, that the condition of not being pregnant is not an "illness." The court on review finds the natural function of the reproductive organs is to procreate. The evidence makes clear that both Mr. Witcraft, by low sperm production with decreased motility, and Mrs. Witcraft, by irregular ovulation, have conditions of their respective reproductive systems in which there is incorrect

functioning.... The conditions of each being treated are therefore the incorrect functioning of their reproductive organs which, by treatment, may result in pregnancy. The mere fact that the treatment may occur outside the body of one or the other or in the subsequent course of insemination is not material because it is the natural function of the organs, reproduction, which is in fact treated and because the plan under consideration here does not exclude the treatment provided. If the natural function of the plaintiffs' reproductive systems could be restored by a simple operation there would be no dispute here. There is no language in the policy which would differentiate this treatment.

In evidence is a letter from the couple's treating doctor explaining their infertility problem. The letter states in pertinent part:

In essence, ... the infertility has been caused by two problems. One, [Jill does not] ovulate on a regular basis due to a pathological condition called polycystic ovary syndrome. Two, [Thomas] has a low sperm count, usually in the range of two million which is quite low, with low percentage motility.

....

Clomid [a fertility drug] was reinstituted in June 1985. Because of the severe low sperm count, washed intrauterine insemination with [Thomas's] sperm was initiated in August 1985. This is a technique where the semen is reduced to a small pellet size and injected directly into the uterine cavity at the time of ovulation.... Two different techniques were used to achieve the intrauterine insemination. One was called washed intrauterine insemination and the second was called Protocol I.

In an earlier letter, also in evidence, the same doctor writes that

Jill and Tom Witcraft suffer from a longstanding infertility problem. This has been due to a combination of [an] ovulatory factor and a low sperm count.... For the time being, Jill will require Clomid [a fertility drug] for induction of ovulation and Tom will require washed intrauterine insemination, which is a technique to concentrate the sperm and inject them into the uterine cavity. The washed intrauterine insemination is $40 per insemination, and insemination is usually done once per cycle. Occasionally, a second insemination is necessary. We also have one other approach to the treatment of the low sperm count which will improve motility. This other approach is also intrauterine insemination and is called Protocol I, and costs $150 per insemination; however, we have tried this for several cycles and it has not worked and for the time being I anticipate only the $40 intrauterine inseminations.

Each letter supports the district court's finding that the infertility problem is due to abnormal functions in the reproductive systems of *both* plaintiffs. To alleviate the problem, drug therapy was prescribed for Jill to induce ovulation. Initially, a washed intrauterine insemination procedure was used. Later, a more complex and expensive intrauterine insemination procedure called Protocol I was used. In the latter procedure semen from Thomas was placed through an albumin gradient which markedly improves the sperm's mobility. The semen was then reduced to a small pellet size and injected directly into the uterine cavity at the time of ovulation.

From this evidence it is readily apparent that, contrary to Sundstrand's assumption, the Protocol I procedure was not performed on a "healthy" Jill. And, contrary to the magistrate's finding, this procedure, in the broad sense, does help to reverse the dysfunction of the reproductive organs of both parties. As for Thomas, the procedure alleviates the problem of low sperm count and low sperm motility. As for Jill, the procedure allows the sperm to be injected directly into the uterus at the time she is ovulating, a condition that must be induced by fertility drugs because of its irregularity. Under these circumstances, we think the Witcrafts' infertility problem is an "illness" as that term is used in the plan and

that the procedure in question is a means of treating this illness.

Sundstrand would take issue with our conclusion that artificial insemination is a treatment. "Treatment" is a broad term covering "all the steps taken to effect a cure of an injury or disease, including examination and diagnosis as well as [the] application of remedies." *Black's Law Dictionary* 1346 (5th ed. 1979). Though we think such a broad definition covers the procedure in the Witcrafts' circumstances, as we concluded above, we note the plan does not speak in terms of "treatment of an illness or injury." Instead, the plan covers "expenses *relating* to injury or illness," language that is considerably broader in scope. (Emphasis added.) The plan's language suggests to the average reader that *any* expenses incurred because of, rather than as treatment for, the infertility problem of the couple are covered. Such an interpretation is in accord with our familiar rule that insurance language should be interpreted from the viewpoint of an ordinary person, not a specialist or expert. *Benzer v. Iowa Mut. Tornado Ins. Ass'n*, 216 N.W.2d 385, 388 (Iowa 1974).

Moreover, Sundstrand's use of broad coverage language brings into play another familiar rule: "An insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." *Id.* We, like the district court, note the plan provides for no exclusion of artificial insemination procedures, nor does it provide for any limitation of the broad term "illness."

We also note the plan excludes charges incurred for sterilization reversals, voluntary abortions, and the pregnancy of a nonemployee. These are all matters dealing with procreation and thus have some relation to the treatment in question. In these circumstances we can reasonably assume that had Sundstrand intended to exclude artificial insemination procedures it would have done so as it did with abortion, pregnancy, and sterilization reversals. Again, the average reader who notes the absence of artificial insemination procedures among these particular exclusions dealing with procreation could reasonably expect such procedures were intended to be covered under the plan. When, under these circumstances, any ambiguity results because of the broad language used and because of the absence of any exclusion, we construe the ambiguity in favor of the insured. *Benzer*, 216 N.W.2d at 388.

Sundstrand's past payments of medical expenses relating to the couple's infertility problem furnishes still another reason in support of the district court's decision. Before it denied payment for the Protocol I procedure, Sundstrand paid for semen analysis, sperm counts, ultrasound on Jill to determine the effectiveness of the insemination procedures, fertility drugs to induce ovulation in Jill, and the less expensive washed intrauterine insemination procedure.

In resolving the meaning of the broad coverage language, we give effect to the practical construction placed on the agreement by the parties. *Federal Land Bank of Omaha v. Bollin*, 408 N.W.2d 56, 61 (Iowa 1987). By paying for these charges, Sundstrand gave clear meaning to the coverage language: all expenses incurred in connection with the infertility problem, including insemination procedures, would be paid. Of course, that was certainly the meaning the Witcrafts put on the coverage language.

III. We conclude the district court correctly determined that outpatient expenses incurred for the Protocol I insemination procedure are expenses related to an illness and are thus covered under the plan. Accordingly, we affirm.

AFFIRMED.