**FIRST NEWTON NATIONAL BANK, Appellee,**

v.

**GENERAL CASUALTY COMPANY OF WISCONSIN, General Casualty Company of Illinois, and Regent Insurance Company, Appellants,**

**Travelers Insurance Company, Defendant.**

No. 87–700.

Supreme Court of Iowa.

June 15, 1988.

Jack W. Rogers, Des Moines, for appellants.

Robert M. Austin, Minneapolis, Minn., and Richard E.H. Phelps II, Newton, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

In this declaratory judgment action we must decide whether the district court properly found that the appellant insurance companies have potential liability in a lawsuit against a policyholder, the First Newton National Bank, and therefore have a duty to defend the bank on all counts in that suit. First Newton was sued with other parties for alleged misconduct in the financing of two distressed farms.

The appellants here are the General Casualty Company of Wisconsin and the Re-

gent Insurance Company.[1] They argue, in effect, that potential liability does not exist because the alleged acts and injuries over which First Newton is being sued did not take place during the effective period of their policies and were not covered by the policies in any event. They also contend that a duty to defend First Newton on one count does not give rise to such a duty on all counts.

We hold that the appellants were properly found to have potential liability and, therefore, a duty to defend First Newton on all counts. Accordingly, we affirm the district court's judgment.

## I. *Background Facts and Proceedings.*

A. *The underlying lawsuit.* This case arose because the First Newton National Bank was sued by the original owners of properties on which mortgages were executed in return for substantial loans. These plaintiffs were members of the Iske and the Nearmyer families. Each family owned a farm, and these farms were incorporated, the Iskes' on September 25, 1980, and the Nearmyers' on January 11, 1984. The family members were the stockholders of each corporation.

In their petition against First Newton and other parties, the Iskes and the Nearmyers allege the following facts.

Iske Farms, Inc., had had difficulty meeting its financial obligations for some time prior to 1983. The Iskes learned of a local doctor, Bernhard G. Wiltfang, who, with his wife Bernadine, owned Beef Barons, Inc. Dr. Wiltfang, they were told, was interested in financing distressed farms.

On August 24, 1983, the Iskes entered into an agreement with Wiltfang under which they were to sell all of their personal assets to Iske Farms and then transfer all of the stock in Iske Farms to Beef Barons. In return, Wiltfang agreed to obtain financing that would pay Iske Farms' debts and provide working capital for the farming operations. The Iskes also entered into an

option agreement with Beef Barons on the same date to allow them to buy back the Iske Farms stock when the corporation became financially secure.

Shortly thereafter, Wiltfang mortgaged the real and personal property of Iske Farms to the First Newton National Bank in return for a loan of $525,000. Of this money, Wiltfang used $400,000 to pay only some of Iske Farms' debts. He also executed a check in the amount of $55,000 to Beef Barons and another for $10,000 to the loan broker who had told the Iskes about him. Both payments were made without the Iskes' knowledge.

Through January 1984 Wiltfang collected all income from the farming operations but did not, despite his alleged promises, buy any additional livestock or provide additional capital. By this time, only $700 of the loan money was left. On January 16 Wiltfang told the Iskes that they would have to make the first loan payment of $26,000 to First Newton. On January 17 Wiltfang, on behalf of Beef Barons, notified the Iskes that the corporate assets of Iske Farms were being liquidated. Later that year, beginning on June 21, he directed the removal of personal property from the premises of Iske Farms and, on July 5, caused Iske Farms to sell all of its property to Beef Barons for a nominal amount.

The Nearmyers' transactions with Wiltfang followed a similar pattern, except that they already owed First Newton $142,000 when they met him. At that time the bank had instituted foreclosure proceedings against them.

In late 1983, after the foreclosure proceedings had begun, a First Newton officer told the Nearmyers about Wiltfang's interest in financing farms. After meeting with him, the Nearmyers formed a corporation on January 11, 1984 and transferred all of the Nearmyer real and personal farm property to it. All stock in the newly formed Nearmyer Acres, Inc., was immediately transferred to Beef Barons, and an option

---

1. General Casualty Company of Illinois is listed in the notice of appeal as an appealing party. No relief was granted against it in the district court. In oral argument the appellants' counsel informed this court that the company was erroneously included as a party to this appeal. Accordingly, we do not consider it as an appellant.

agreement similar to the Iskes' was also executed.

Wiltfang then mortgaged Nearmyer Acres' real and personal property to First Newton in return for a loan of $336,000. As he had with the Iskes, Wiltfang paid only some of the Nearmyer debts and disbursed a substantial amount, $36,600, to himself. In addition, about $9900 was paid to First Newton for various fees. These payments were made without the Nearmyers' knowledge.

Wiltfang again took no action to increase the cash flow of the farm. On July 3, 1984, Beef Barons and Nearmyer Acres gave the Nearmyer family notice that the Nearmyer Acres corporate assets would be liquidated. Nearmyer Acres commenced a replevin action on November 16 to gain immediate possession of the farm property.

Finally, on December 18, 1984, First Newton initiated foreclosure proceedings against the Iskes and the Nearmyers. On January 4, 1985, the Iskes and the Nearmyers simultaneously filed, with their answers and counterclaims in the foreclosure actions, a separate petition at law that alleged the facts described above.[2]

In their petition the Iskes and the Nearmyers made several allegations concerning First Newton. Count I of the petition alleges fraud against all defendants, including First Newton.

Count II, entitled "Negligent Misrepresentation," claims First Newton made false and misleading statements to the Iskes and the Nearmyers; failed to disclose material facts; failed to exercise reasonable care in explaining the stock purchase/option agreement and in drafting the documents; and was negligent in explaining the transaction and in failing to disclose material facts. The bank's negligence is alleged to have been the proximate cause of the Iskes' and the Nearmyers' damages.

Counts III and IV contend that the defendants, including First Newton, violated the Iowa Uniform Securities Act. Count V alleges constructive fraud against the defendants. Counts VI and VII are apparently not directed toward First Newton. As to these causes of action, the petition claims damages for emotional distress, loss of real and personal property, loss of the farming businesses and profits, and the actual or threatened loss of the families' homes.

B. *The insurance policies.* First Newton was insured by the Travelers Insurance Company[3] from February 22, 1983 to February 24, 1984 and by the appellants from February 22, 1984 to February 22, 1985. The Travelers policy, which is not at issue in this appeal, provided comprehensive liability coverage.

The appellants issued two policies to First Newton. One policy provided comprehensive liability coverage and was called a "special multi-peril policy." The other, a "commercial umbrella liability policy," provided comprehensive general liability coverage for liability in excess of the amount covered by the multi-peril policy.

The multi-peril policy states that
[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
a. bodily injury or
b. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

The policy defines "property damage" as
(1) physical injury to or destruction of tangible property which occurs during

---

**2.** The counterclaims in the foreclosure actions also alleged these facts. Hence, our discussion here will concern the appellants' duty to defend First Newton against both the allegations in the counterclaims and those in the separate Iske–Nearmyer petition. For the sake of conve-

nience, however, we will refer only to the latter action in this opinion.

**3.** Travelers, a defendant in this case, offers no arguments regarding the issues raised by the appellants.

the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period. . . .

"Bodily injury" means "bodily injury, sickness or disease sustained by any person which occurs during the policy period." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

The "extended liability coverage endorsement" portion of this policy provides that

[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

A "personal injury" includes "wrongful entry or eviction or other invasion of the right of private occupancy."

The umbrella policy affords indemnification to the insured

for all sums which the insured shall be obligated to pay by reason of the liability . . . imposed upon the insured by law . . . for ultimate net loss on account of:
(a) personal injuries . . .,
(b) property damage . . .

caused by or arising out of each occurrence happening anywhere in the world, during the policy period.

The insurer again agrees to defend the insured in any suit seeking damages on account of personal injury, property damage, or advertising liability, even if any of the allegations of the suit are groundless, false, or fraudulent.

"Personal injury" under the umbrella policy includes "bodily injury, sickness, disease, shock, mental anguish and mental injury" and "wrongful entry or eviction, or other invasion of the right of private occupancy." "Property damage" is an "injury to or destruction of tangible property." And "occurrence" is defined here as

an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one . . . location shall be deemed one occurrence.

The "financial institutions amendatory endorsement" of this policy provides in part that the policy does not apply to

claims arising out of error or omission or a mistake committed or alleged to have been committed by or on behalf of the insured in the conduct of any of the insured's business activities or the rendering of or failure to render any professional service.

C. *The present case.* In this declaratory judgment action, First Newton requested that the district court determine the appellants' and Travelers' duties under their policies. The court found that the appellants had potential liability in the suit against First Newton and therefore had a duty to defend the bank on all counts in that suit. The court also found that Travelers had no potential liability.

The appellants now argue that the district court erred when it determined: (1) that the "occurrences" for which First Newton is being sued took place while the appellants' policies were in effect; (2) that the allegation of negligent misrepresentation against First Newton, which was made while the appellants' policies were in effect, constituted a covered "occurrence;" (3) that the injuries allegedly caused by First Newton were of the types covered under the terms of the policies; (4) that the financial institutions amendatory endorsement

of the umbrella policy did not exclude coverage of First Newton's alleged actions; and (5) that the appellants' duty to defend First Newton on one count of the Iske–Nearmyer petition gave rise to a duty to defend on all counts.

As we will explain below, we do not think these findings of the district court are erroneous.

## II. *Duty to Defend.*

■ An insurer has a duty to defend whenever there is potential or possible liability to indemnify the insured based on the facts appearing at the outset of the case. *McAndrews v. Farm Bureau Mut. Ins. Co.,* 349 N.W.2d 117, 119 (Iowa 1984). We look first and primarily to the petition for the "facts at the outset of the case." *See id.* When necessary we expand our scope of inquiry to any other admissible and relevant facts in the record. *Id.*

## III. *The Occurrence Issue.*

The appellants contend their policies do not provide coverage because none of the conduct and damages alleged took place during the effective period of their policies. The district court concluded the time of an "occurrence" under the policies is the time when the claimant sustains actual damages and not the time when the act or omission that caused such damages was committed.

Although the appellants did not raise the damage issue in the district court, Travelers did. Travelers argued that the damages, rather than the conduct, was the triggering event. It argued further that although the conduct occurred during its policy period, the damages occurred beyond that period and at a time when the appellants' policies were in force.

The district court agreed, concluding that "the damages, as alleged in the Iske–Nearmyer petition, occurred during the period when the [appellants'] policies were in effect, and that if there is any coverage, it is under the [appellants'] policies and not under the Travelers policy."

■ Liability policies generally fall into two classifications: an "occurrence" policy and a "claims made" policy. The occurrence policy provides coverage if the event insured against (the "occurrence") takes place within the policy period, regardless of when a claim is made. In contrast, a claims made policy provides coverage only if a claim of the insured's liability arising from a covered hazard is presented during the policy period. Annotation, *Event As Occurring Within Period of Coverage of "Occurrence" and "Discovery" or "Claims Made" Liability Policies,* 37 A.L. R. 4th 382, 390 (1985). The policies here are of the occurrence type.

Most jurisdictions that have considered "occurrence" policies have concluded that the time of the "occurrence" is when the claimant sustains actual damage and not when the act or omission that caused such damage was committed. *Id.* at 390; *see, e.g., Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56 (3rd Cir.1982) (apparently applying Massachusetts and Pennsylvania law); *Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27 (1st Cir.1981) (applying Rhode Island law); *Kirkham, Michael & Assocs., Inc. v. Travelers Indem. Co.,* 493 F.2d 475 (8th Cir.1974) (applying South Dakota law); *Kansas City Insulation Co. v. American Mut. Liab. Ins. Co.,* 405 F.2d 53 (8th Cir.1968) (applying Pennsylvania law); *Nielson v. Travelers Indem. Co.,* 174 F.Supp. 648 (N.D.Iowa 1959) (applying Iowa law), *aff'd,* 277 F.2d 455 (8th Cir. 1960); *State v. Glens Falls Ins. Co.,* 125 Ariz. 328, 609 P.2d 598 (App.1980); *Wolf Machinery Co. v. Insurance Co. of N. Am.,* 133 Cal.App.3d 324, 183 Cal.Rptr. 695 (1982); *Samuelson v. Chutich,* 187 Colo. 155, 529 P.2d 631 (1974); *Tiedemann v. Nationwide Mut. Fire Ins. Co.,* 164 Conn. 439, 324 A.2d 263 (1973); *National Aviation Underwriters, Inc. v. Idaho Aviation Center Inc.,* 93 Idaho 668, 471 P.2d 55 (1970); *Great Am. Ins. Co. v. Tinley Park Recreation Comm'n,* 124 Ill.App.2d 19, 259 N.E.2d 867 (1970); *United States Fidelity & Guar. Co. v. American Ins. Co.,* 169 Ind.App. 1, 345 N.E.2d 267 (1976); *Scott v. Keever,* 212 Kan. 719, 512 P.2d 346 (1973); *Oceanonics, Inc. v. Petroleum Distrib. Co.,* 280 So.2d 874 (La.App.1973); *Moss v. Shelby Mut. Ins. Co.,* 105 Mich.App. 671,

308 N.W.2d 428 (1981); *Singsaas v. Diederich*, 307 Minn. 153, 238 N.W.2d 878 (1976); *Dennis Cain Motor Co. v. Universal Underwriters Ins. Co.*, 614 S.W.2d 275 (Mo. App.1981); *Peerless Ins. Co. v. Clough*, 105 N.H. 76, 193 A.2d 444 (1963); *Paterson Tallow Co., Inc. v. Royal Globe Ins. Cos.*, 89 N.J. 24, 444 A.2d 579 (1982); *American Motorists Ins. Co. v. E.R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup. Ct.1978); *see also* 7A J.A. Appleman, *Insurance Law and Practice* § 4491.01, at 5 (W.F. Berdal ed. 1979). Very few jurisdictions hold that the act causing the damage is the triggering event. *See, e.g., Kremers–Urban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 351 N.W.2d 156 (1984).

The policies here are in accord with the majority view. The multi-peril policy defines "occurrence" as "an accident ... which results in bodily injury or property damage." The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by any person *which occurs during the policy period.*" (Emphasis added.)

The umbrella policy indemnifies for personal injuries and property damage "caused by or arising out of each occurrence happening anywhere in the world, *during the policy period.*" (Emphasis added.) The policy defines "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in a personal injury, property damage or advertising liability *during the policy period.*" (Emphasis added.)

■ We agree with the district court and First Newton that the petition alleges damages that occurred while both policies were in effect. Both policies insured First Newton from February 22, 1984 to February 22, 1985.

First Newton started foreclosure proceedings against Iske Farms, Inc., and Nearmyer Farms, Inc., on December 18, 1984, during the period of both policies. On January 4, 1985, the Iskes and the Nearmyers joined in a petition against First Newton. They also filed counterclaims against First Newton in the fore-

closure actions. The petition and counterclaims were identical. The petition alleges damages as of its filing date.

The petition seeks damages on behalf of the Iskes and the Nearmyers for loss of real property, loss of personal property, actual or threatened loss of homes, severe emotional distress, and loss of the farming businesses, including loss of income.

The petition further alleges that "[b]eginning on June 21, 1984, the equipment, livestock, and other [personal] property ... were taken from the premises of Iske Farms, Inc., at the direction of Dr. Wiltfang." The petition also alleges that "[o]n July 5, 1984, Dr. Wiltfang caused Iske Farms, Inc., to sell all of its real property, machinery, livestock, and other property to Beef Barons, Inc. for $2.00."

As far as allegations of damages regarding the Nearmyers, the petition alleges that "[o]n July 3, 1984, Beef Barons, Inc., and Nearmyer Acres, Inc., gave notice to Carroll Nearmyer of their intention to liquidate the assets of Nearmyer Acres, Inc." The petition also alleges that "[o]n or about November 16, 1984, Nearmyer Acres, Inc., commenced an action in replevin which required immediate possession of farm machinery and livestock."

We believe these are sufficient allegations of property and bodily injury damages occurring within the effective dates of the policies.

IV. *The Negligent Misrepresentation Issue.*

The appellants next contend the district court erred when it concluded that the negligent misrepresentation theory constituted an occurrence under the policies. They maintain that a cause of action for negligent misrepresentation does not arise from an occurrence that is neither expected nor intended. In short, the appellants argue the actions of the bank were not accidental but were of an intentional nature and, therefore, not included in the definition of "occurrence" under the policies.

■ The multi-peril policy defines "occurrence" as "an accident, including contin-

uous or repeated exposure to conditions, which results in bodily injury or property damage neither *expected nor intended from the standpoint of the insured.*" (Emphasis added.) The umbrella policy's definition of "occurrence" is slightly different: "an accident or a happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally results in a personal injury.*" (Emphasis added.)

Recently we interpreted similar language in homeowner and umbrella policies. *See Altena v. United Fire & Casualty Co.*, 422 N.W.2d 485, 486 (Iowa 1988). The homeowner policy excluded coverage for bodily injury "which is expected or intended by the insured." The umbrella policy excluded from its coverage "any act committed by ... the insured with intent to cause personal injury." With respect to such exclusions of intentional acts, we adopted the majority view, which does not allow these exclusions to be applied unless there is proof that the insured both intended the act *and* intended to cause some injury. *Altena*, 422 N.W.2d at 490.

We think the same requirement applies to the definition of "occurrence" in the policies here. An accident, happening, event, or exposure to conditions is an unexpected and unintended "occurrence" so long as the insured does not expect or intend both it *and* some injury.

The petition here falls short of alleging any intention to cause injury to the Iskes and the Nearmyers. Although the petition alleges some fraudulent conduct on the part of First Newton, in the main it alleges negligent conduct by the bank and alleges that its negligence, rather than any intentional conduct by it, was the proximate cause of the Iskes' and the Nearmyers' damages.

These are allegations of negligent misrepresentation. The very definition of "negligent misrepresentation" connotes negligent rather than intentional conduct:

[o]ne, who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information.*

*Beeck v. Kapalis*, 302 N.W.2d 90, 97 (Iowa 1981) (quoting Restatement (Second) of Torts § 552 (1977) (emphasis added)); *accord Pahre v. Auditor of State*, 422 N.W. 2d 178, 179–80 (Iowa 1988); *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W. 2d 281, 287 (Iowa 1981); *Ryan v. Kanne*, 170 N.W.2d 395, 402 (Iowa 1969). Comments a and e to Restatement section 552 buttress this connotation. Comment a points out that liability for negligent misrepresentation is more restricted than that for fraudulent misrepresentation because "there is no intent to deceive but only good faith coupled with negligence." Comment e significantly states that "[s]ince the rule of liability [for negligent misrepresentation] is based upon negligence, the defendant is subject to liability if, but only if, he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information." In a similar vein, one court said:

Knowing a reckless falsity is an essential element of fraud. It is the absence of this element which distinguishes fraud from mere negligent misrepresentations, and has been recognized as a sufficient basis for the recovery of actual damage. Since the policy expressly covers negligence and the facts alleged in the complaint create the reasonable possibility of recovery under that theory, we hold the trial court did not err in concluding appellant had a duty to defend.

*Gordon–Gallup Realtors, Inc. v. Cincinnati Ins. Co.*, 274 S.C. 468, 471, 265 S.E.2d 38, 40 (1980) (citations omitted).

We think the petition alleges negligent rather than intentional conduct on the part of First Newton. *Cf. Larsen*, 300 N.W.2d at 285 (plaintiff's claim that financial institution supplied misinformation was "grounded on a theory of negligence"). Under these circumstances, "[w]here a

complaint is framed in terms of an insured's negligence and not in terms of a cause of action or risk excluded by the policy, there is a duty to defend." 7C Appleman § 4683.01, at 65.

### V. *The Damage Issue.*

The appellants also contend the damages alleged in the petition are not covered by the policies. The appellants assert two bases for their contention. First, there is no loss of use of tangible property unless there is physical damage to the property itself or at least physical damage to some other property that results in the loss of use of covered property. The appellants claim that no personal property damage meeting these criteria is alleged. Second, none of the damages alleged falls within the definition of "bodily injury" or "personal injury" in the multi-peril policy, or within the definition of "personal injury" in the umbrella policy.

■ The multi-peril policy covers "property damage," which is defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." The umbrella policy also covers "property damage," which is defined in that policy as an "injury to or destruction of tangible property."

As to property damage, the petition alleges that "the Iskes and the Nearmyers have lost all of their real and nearly all of their personal property; have or may be put out of their homes; ... have and will lose profits that would have been realized from their farming operations."

We think these allegations of property damage are sufficient to meet the definition of "property damage" in both policies.

We hold that the definition of "property damage" in both policies does not require physical injury to tangible property before the loss of use is covered.

Our conclusion is in step with the conclusions reached by the majority of courts that have interpreted similar provisions in the face of similar arguments. We find persuasive the following reasoning of one such court:

We read the policy as written. We are not free to revise it.... "There is nothing in this definition [of property damage] requiring physical injury [to] or destruction of property. The guide to determination of coverage is the kind of property rather than the kind of injury. Tangible property rendered useless is injured and hence is covered, since the definition of damages includes loss of use of property resulting from property damage." We, like a majority of courts considering this issue, conclude that "the term property damage does not require actual physical damage but can include tangible damage such as diminution in value of tangible property."

*Continental Casualty Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 147–48, 461 N.E.2d 209, 212–13 (1984) (citations omitted) (complainant alleged "deprivation of use," "diminution in value," and "lost income;" insurer claimed loss of use not covered without physical injury to tangible property); *accord Aetna Casualty & Sur. Co. v. PPG Indus., Inc.*, 554 F.Supp. 290, 293 (D.Ariz.1983) (diminution in value claimed); *Travelers Ins. Co. v. De Bothuri*, 465 So.2d 662, 662–63 (Fla.App.1985) (policy defined "property damage" as "injury to or destruction of tangible property;" loss of use resulting from theft claimed); *Pittway Corp. v. American Motorists Ins. Co.*, 56 Ill.App.3d 338, 341, 13 Ill.Dec. 244, 246–47, 370 N.E.2d 1271, 1273–74 (1977) (policy defined "property damage" as "injury to or destruction of tangible property;" loss of use alleged); *Sterilite Corp. v. Continental Casualty Co.*, 17 Mass.App.Ct. 316, 320, 458 N.E.2d 338, 342 (1983) (policy defined "property damage" as "injury to or destruction of tangible property;" loss of use claimed); *Sola Basic Indus., Inc. v. United States Fidelity & Guar. Co.*, 90 Wis.2d 641, 652–54, 280 N.W.2d 211, 217 (1979) (policy defined "property damage"

as "injury to or destruction of tangible property;" economic loss claimed).

■ The multi-peril policy only covers bodily injury which the policy defines as "bodily injury, sickness, or disease." The extended liability coverage endorsement, however, covers "personal injury," which is defined as an "injury arising out of ... wrongful entry or eviction or other invasion of the right of occupancy." An "injury" is "[a]ny wrong or damage done to another, either in his person, rights, reputation or property." *Black's Law Dictionary* 706 (5th ed. 1979). This definition of injury coupled with the definition of "personal injury" in the extended liability coverage endorsement are broad enough, as the district court concluded, to encompass the petition's allegation that the Iskes and the Nearmyers "have and may be put out of their homes."

■ The umbrella policy also covers "personal injury" but defines it more broadly as "bodily injury, sickness, disease, *shock, mental anguish,* and *mental injury.*" (Emphasis added.) The petition alleges that the Iskes and the Nearmyers "have and will suffer severe emotional distress." Emotional distress " 'is a personal injury familiar to the law.' " *Blessum v. Howard County Bd. of Supervisors,* 295 N.W.2d 836, 845 (Iowa 1980) (quoting *Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252, 265 (1978)); *see also Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 860 (Iowa 1973) (basic claim for mental and emotional harm is a separate cause of action). It includes all highly unpleasant mental reactions. *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981). We agree with the district court that the umbrella policy's definition of "personal injury" is broad enough to include emotional distress.

## VI. *The Exclusionary Endorsement Issue.*

Another issue we must decide is whether the financial institutions amendatory endorsement of the umbrella policy excludes the Iske–Nearmyer negligence claims from coverage. This endorsement provides in part that the policy does not apply to

claims arising out of error or omission or a mistake committed or alleged to have been committed by or on behalf of the insured in the conduct of any of the insured's business activities or the rendering of or failure to render any professional service.

The district court found that this language was ambiguous because it could be read to exclude all negligence claims. The court said that "[i]f the endorsement were held to bar coverage for all allegations of negligence, the umbrella policy would cover practically nothing.... [The appellants] would be reduced to the status of ... mere premium collectors[s]." The court then construed the exclusion to permit coverage of negligence claims. According to the court, the appellants had potential liability under the policy and, therefore, a duty to defend First Newton because the Iske–Nearmyer petition alleged negligence, a coverable claim.

The appellants now argue that the district court erred in finding the endorsement ambiguous and in construing it to allow coverage of all negligence claims. They maintain that the endorsement very specifically excludes any claim arising out of the insured's professional services. The negligence claims against First Newton, they assert, have the bank's professional services as their basis and are, therefore, excluded from coverage.

First Newton, on the other hand, argues that the district court was correct in finding that negligence claims do not fall under the exclusion, and we agree.

■ As we have already said, an insurer is not required to defend in an action against an insured unless the action subjects the insurer to potential liability under the insurance policy. *McAndrews,* 349 N.W.2d at 119; *State Farm Auto. Ins. Co. v. Malcolm,* 259 N.W.2d 833, 835 (Iowa 1977); 7C Appleman § 4684.01, at 91–92. Hence, the appellants here have no duty to defend First Newton against the negligence claims if such claims are excluded

from potential coverage by the amendatory endorsement.

Certain well established principles guide our determination of the scope of an insurance policy's exclusionary terms. The insurer, "having affirmatively expressed coverage through broad promises," has a duty to define limitations or exclusions clearly and explicitly. *Witcraft v. Sundstrand Health & Disability Group Benefit Plan,* 420 N.W.2d 785, 790 (Iowa 1988); *Malcolm,* 259 N.W.2d at 835. The insurer, therefore, has the burden to prove the applicability of exclusions. *Malcolm,* 259 N.W.2d at 835.

When the language of a policy is ambiguous by way of being susceptible to more than one interpretation, we are bound to construe it. *See id.* at 836; *see also North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987); *State Auto. & Casualty Underwriters v. Hartford Accident & Indem. Co.,* 166 N.W.2d 761, 763 (Iowa 1969). Our construction will be in the light most favorable to the insured because an insurance policy is a contract of adhesion. *Malcolm,* 259 N.W.2d at 836; *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.,* 227 N.W.2d 207, 210 (Iowa 1975); *see also* 7C Appleman § 4684.01, at .99–100 ("doubt as to liability and [the] insurer's duty to defend should be resolved in favor of the insured"). "In keeping with that principle, exclusions are strictly construed against the insurer." *Malcolm,* 259 N.W. 2d at 836; *Connie's Constr. Co.,* 227 N.W. 2d at 210. The court will ascertain what the insured as a reasonable person would understand the policy to mean, rather than what the insurer actually intended. *Central Bearings Co. v. Wolverine Ins. Co.,* 179 N.W.2d 443, 445 (Iowa 1970); *accord Witcraft,* 420 N.W.2d at 790; *Rodman v. State Farm Mut. Auto. Ins. Co.,* 208 N.W.2d 903, 906 (Iowa 1973); *see also Holty,* 402 N.W.2d at 454.

■ Here, we must first decide whether the language in question is ambiguous. Like the district court, we think it is.

This language excludes from coverage claims arising from errors, omissions, or mistakes related to First Newton's professional services. Read broadly, the words of the policy could be interpreted to exclude any claim of negligence related to professional services, as the appellants argue, or even all claims of negligence. Construed more narrowly and literally, as First Newton would have us do, the language might instead mean that only claims of errors, omissions, or mistakes are excluded. While we do not, at this point of our analysis, decide what construction is proper, we do think that the language in question is, "without violence," susceptible to more than one interpretation. *See Malcolm,* 259 N.W.2d at 836. As such, it is ambiguous and must be construed by this court. *See id.*

We have never faced a problem of construction similar to this one, so we are guided here by the decisions of other courts. In *Aitchison v. Founders Ins. Co.,* 166 Cal.App.2d 432, 435, 333 P.2d 178, 180 (1958), an insurance policy indemnified the insured for claims arising from "negligent acts, errors or omissions [committed in] the conduct of insured's business." The claim in question alleged that the insured had made an "error" in a business transaction. In finding that coverage existed under the language quoted above, the court noted that the insurer had "not ... asserted that the word 'error' ... is modified by the word 'negligent.'" *Id.* at 438, 333 P.2d at 182. In other words, the policy covered "*negligence,* errors or omissions." *Id.* at 441, 333 P.2d at 184 (emphasis added). The court then found that the insurer "intended the word ['error'] to have its ordinary meaning," thereby providing separate coverage for claims that were not based on "omissions" or "negligent acts." *Id.* at 438, 333 P.2d at 182. We think this reading indicates a very literal approach to interpreting the language of insurance policies.

Another example of literal interpretation is in *Burns v. American Casualty Co.,* 127 Cal.App.2d 198, 273 P.2d 605 (1954). There, two insurance policies covered claims based on "malpractice, error or mistake," and another policy covered claims of "malpractice, error, negligence or mis-

take." All of the policies concerned claims arising from the insured's professional services. *Id.* at 202–03, 273 P.2d at 608. The plaintiffs contended that these words of the policies should be read together to mean, simply, "malpractice." *Id.* at 203, 273 P.2d at 608. The court disagreed, saying that each word indicated coverage of a separate type of claim. *See id.* at 203, 273 P.2d at 608–09. According to the court, "mistake," "error," and "negligence" necessarily mean more than the narrow term "malpractice." *Id.* at 203, 273 P.2d at 608–09.

In a case that, like the present one, involved an exclusionary term, an insurance agent's professional negligence policy said that it did not apply to claims brought about "by the dishonest, fraudulent, criminal, or malicious" acts or omissions of the insured. *National Sur. Corp. v. Musgrove*, 310 F.2d 256, 258–59 (5th Cir.1962). The insurer claimed that this exclusion encompassed not just "ordinary" fraud but also the broad concept of "legal" fraud. *Id.* at 260. The court found this construction to be "unreasonable." *Id.* at 261. It said that the "ordinary insurance agent" would be unlikely to think that such exclusionary language "would encompass so all embracing a concept as 'legal fraud.'" *Id.* The court pointed out that the words of the policy should be given their literal, "ordinary meaning" because a broader construction "would rob the insured of the very coverage he assumed he was getting." *Id.*

We think the broad reading urged by the appellants here would do just that to First Newton: if negligence claims were excluded, the bank would be deprived of the coverage it thought it was getting.

The amendatory endorsement lists "error," "omission," and "mistake" as the only bases for excluded claims. "Negligence" is not mentioned. In *Aitchison, Burns,* and *National Surety,* by contrast, the proffered constructions were, at least, based on words actually contained in the policies; in *National Surety,* for example, the insurer said that the word "fraudulent" included "legal fraud." Here, however, the appellants urge us to *add* "negligence" to

the other three bases for excluded claims. This we will not do. The appellants had a duty to define their policy exclusions clearly and explicitly. *See Malcolm,* 259 N.W.2d at 835. They failed to do so.

Furthermore, we think the literal approach to construction as demonstrated in *Aitchison, Burns,* and *National Surety* is appropriate here. In those cases the courts gave effect to the "ordinary" meanings of the words in question. *See National Sur.,* 310 F.2d at 261; *Aitchison,* 166 Cal.App.2d at 438, 333 P.2d at 182; *cf. Burns,* 127 Cal.App.2d at 203, 273 P.2d at 608–09. This approach seems to be the simplest way of ascertaining what the insured as a reasonable person would understand the policy to mean. *See Central Bearings Co.,* 179 N.W.2d at 445. By construing the words of a policy literally, we can avoid giving the insurer the benefit of hidden meanings that a reasonable person could not, without special knowledge, divine.

Here, we do not think a reasonable person would understand the words "error," "omission," and "mistake" to include the concept of "negligence." Instead, we think the amendatory endorsement excluded, in the context of professional services, claims based on only the first three terms, thereby allowing coverage of negligence claims. This strict construction of the exclusions, *see Malcolm,* 259 N.W.2d at 836; *Connie's Constr. Co.,* 227 N.W.2d at 210, will ensure that the understanding of the insured, not the insurer, prevails, *see Central Bearings Co.,* 179 N.W.2d at 445.

In summary, we hold that the amendatory endorsement of the umbrella policy does not exclude any negligence claims against First Newton. Accordingly, the appellants have potential liability under this policy and, therefore, a duty to defend First Newton. *See Malcolm,* 259 N.W.2d at 835; 7C Appleman § 4684.01, at 91–92.

### VII. *The Duty to Defend on All Counts Issue.*

Last, we must decide whether the appellants' duty under the policies to defend First Newton on the negligence claims

gives rise to a duty to defend the bank on all counts of the Iske–Nearmyer petition. Like the district court, we think it does, even if the other counts are outside of the policy's coverage.

■ The appellants contend that in Iowa an insurer is obliged to defend an insured only when a claim against the insured subjects the insurer to potential liability under the policy. This contention is correct, as far as it goes. *See, e.g., McAndrews*, 349 N.W.2d at 119; *Malcolm*, 259 N.W.2d at 835.

We are, however, faced with more than a single claim against First Newton. The allegations of negligence, which we have already held to be within the umbrella policy's coverage, make up but one of several. When both covered and possibly noncovered[4] claims are raised in the same suit against the the insured, the potential exists for the insurer to have either the duty to defend both or the duty to defend only the covered claims. The appellants contend that the Iowa cases involving single claims should be read to mean that an insurer has the duty to defend only the covered claims of a multi-count petition. We have not previously considered this contention.

■ Several other courts, however, have decided the scope of an insurer's duty in such a situation. The apparent majority rule is that when an action against an insured involves both covered and noncovered claims, the insurer is liable for recovery of damages on only the covered claims but has a duty to defend the entire action. *Western Casualty & Sur. Co. v. International Spas of Ariz., Inc.*, 130 Ariz. 76, 79–80, 634 P.2d 3, 6–7 (App.1981) (and authorities cited therein); *accord Harborside Refrigerated Servs., Inc. v. IARW Ins. Co., Ltd.*, 759 F.2d 829, 830 (11th Cir.1985); *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 119 (5th Cir.1983); *Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 625 (8th Cir.1981); *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 142, 301 N.W.2d 832, 835 (1980); *American Employers' Ins. Co. v. Continental Casualty*

*Co.*, 85 N.M. 346, 349, 512 P.2d 674, 677 (1973); 7C Appleman § 4684.01, at 106; 44 Am.Jur.2d *Insurance* § 1418, at 365 (1982). The duty to defend is broader than the duty to indemnify. 7C Appleman § 4684.01, at 102; *accord Harborside*, 759 F.2d at 830; *Howard*, 649 F.2d at 625. This difference exists because it is impossible to determine the basis, if any, upon which the plaintiff will recover until the action is completed. *Western Casualty*, 130 Ariz. at 79, 634 P.2d at 6; *Howard*, 649 F.2d at 625.

Some courts, however, have held that an insurer does not have to provide a defense against claims outside of the policy, even when the suit involves covered claims as well. *See* 7C Appleman § 4684.01, at 107 & n. 59. The apparent rationale for such a holding is that the parties to the insurance policy only contracted for the defense of covered claims by the insurer. *See, e.g., Waite v. Aetna Casualty & Sur. Co.*, 77 Wash.2d 850, 855, 467 P.2d 847, 851 (1970).

We think the majority rule is the better one. It assures that the insured will have a coherent, coordinated defense aimed at defeating all of the claims, rather than separate defenses that might work at cross purposes, since the insurer will be interested primarily in defeating the covered claims. Moreover, we think the reasonable expectation of the insured would be that the insurer would defend the entire action, rather than just part of it.

If, as the appellants fear, there is an "inherent conflict of interest" between them and First Newton, they can simply allow the bank to retain its own counsel and then reimburse it for the cost of the entire defense. *See Howard*, 649 F.2d at 625; 4 Am.Jur.2d *Insurance* § 1415, at 359. Such a conflict does not relieve the appellants of their duty to defend the entire suit. *See Howard*, 649 F.2d at 625; 44 Am.Jur.2d *Insurance* § 1415, at 359.

In summary, because there is at least one covered claim in the Iske–Nearmyer suit against First Newton, the appellants must provide a defense on all counts in that action.

---

4. We take no position on the coverage for claims we have not specifically addressed.

## VIII. *Disposition.*

Having considered all assignments of error raised by the appellants and finding no error, we affirm.

AFFIRMED.