**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**PELLA CORPORATION and Pella Windows and Doors, Inc., Defendants.**

No. 4:07–cv–508–JEG.

United States District Court, S.D. Iowa, Central Division.

June 30, 2009.

Robert VP. Waterman, Jr., Thomas D. Waterman, Lane & Waterman, LLP, Davenport, IA, Charles W. Browning, Danielle Perez, Jeffrey C. Gerish, Lauren Beth McMillen, Plunkett Cooney, Bloomfield Hills, MI, for Plaintiff.

Richard W. Lozier, Jr., Mark E. Weinhardt, Belin Lamson McCormick Zumback & Flynn, P.C., Des Moines, IA, Keith McKenna, Robin L. Cohen, Sheri E. Hametz, Dickstein Shapiro LLP, New York, NY, for Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on cross-motions for summary judgment by Plaintiff Liberty Mutual Insurance Company (Liberty Mutual) and Defendants Pella Corporation and Pella Windows and Doors, Inc. (collectively, Pella), each filed on January 9, 2009. Both parties have filed responses and replies. Plaintiff and Defendants requested oral argument; but, given the nature of the issues and the quality of the written materials, the Court finds oral argument unnecessary to resolution of the current motions. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

This Court's May 15, 2009, Order, 633 F.Supp.2d 714 (S.D.Iowa 2009) (Clerk's No. 129) granting Pella's motion for partial summary judgment and granting in part and denying in part Liberty Mutual's motion for partial summary judgment sets

forth the applicable procedural, factual, and legal background for this case. The Court will not restate that information here and refers the parties back to that Order for specifics.

## II. DISCUSSION

In the present motions, both parties seek partial summary judgment on a number of issues that impact on whether Pella is entitled to coverage for the Underlying Lawsuits under the terms of the Policies.

Liberty Mutual seeks a declaration that there is no potential coverage for the following reasons:

(1) The *Pappas* suit (as of the filing of the third amended complaint and thereafter) alleges damage only to the plaintiffs' windows themselves, which does not constitute an "occurrence," and for which coverage is excluded by the Policies' "your product" and "your work" exclusions, and

(2) Both the *Pappas* suit (as of the filing of the third amended complaint and thereafter) and the *Saltzman* suit from its inception, are confined to claims based in fraud, which precludes the finding of an "occurrence." [1]

Liberty Mutual also moves for partial summary judgment dismissing the fifth cause of action in Pella's second amended counterclaims, on the grounds that there is no "actual controversy" between the parties such that declaratory relief is warranted.

Pella moves for partial summary judgment seeking a declaration that,

(1) The Underlying Lawsuits allege potentially covered claims under the Policies, as they allege covered "property damage," occurring during the relevant policy periods, and caused by an "occurrence";

(2) The Underlying Lawsuits are alleged to arise out of a single "occurrence";

(3) Pella has satisfied any self-insured retention applicable to the Underlying Lawsuits; and, accordingly

(4) Liberty Mutual is obligated to reimburse Pella for its costs of defending the Underlying Lawsuits.

The Court addresses each respective issue below.

### A. Whether the Underlying Lawsuits allege covered "property damage"

█ Both parties first seek a declaration on the issue of whether the Underlying Lawsuits allege "property damage" potentially covered by the Policies. There is no dispute that both suits allege "property damage," given the broad definition of that term included in the Policies.[2] The issue

---

1. In its initial motion (Clerk's No. 96), Liberty Mutual moved for summary judgment only with respect to the *Pappas* suit. In its response to Pella's initial motion for summary judgment, however, it requested summary judgment on one of the same grounds with respect to the *Saltzman* suit, namely that allegations of fraud do not constitute an "occurrence." Pella argues that such motion is inappropriate and is prohibited by Local Rule 7(e), which states,

   A resistance to a motion may not include a separate motion or a cross-motion by the responding party. Any separate motion or cross-motion must be filed separately as a new motion.

   LR 7.1(e). The issue raised in Liberty Mutual's response with respect to the *Saltzman* suit is nearly identical to that before the Court with respect to the *Pappas* suit. Pella has fully briefed the issue already and will suffer no prejudice by this Court's consideration of the issue as it relates to the *Saltzman* suit as well. Because the problems for the Court and adverse parties the rule exists to avoid are not present herein, the Court chooses not to sanction this technical violation of the rule.

2. "Property damage" is defined, in part, to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property." Def.'s App. at 53. Both the *Pappas* and the *Saltzman* suits contain allegations of

presented is whether the Underlying Lawsuits allege "property damage" for which, if proven, there is potential coverage under the Policies. *See* Def.'s App. at 34 (providing that Liberty Mutual "will pay those sums . . . that the insured becomes legally obligated to pay as damages because of . . . 'property damage' *to which this excess insurance applies.*") (emphasis added).

On this first issue, Liberty Mutual moves for partial summary judgment only with respect to the *Pappas* suit. It argues that as of the filing of the third amended complaint and thereafter, the *Pappas* suit alleges damages *only* to the plaintiffs' windows themselves. Consequently, it is asserted, even if the damages alleged were ultimately proven, coverage would be precluded by the Policies' "your product" and/or "your work" exclusions.[3] Pella disagrees with Liberty Mutual's characterization of the *Pappas* allegations as pertaining only to the windows themselves and argues that both of the Underlying Lawsuits allege potentially covered "property damage."

As an initial matter, there appears to be no dispute that physical damage to the structure of the plaintiffs' homes other than the windows themselves could potentially constitute "property damage" covered by the Policies.[4] Both versions of the *Saltzman* complaint, as well as the first three versions of the *Pappas* complaint, explicitly allege "property damage" to the underlying structure of the plaintiffs' homes.[5] Accordingly, the Court finds that the *Saltzman* suit, and the first three versions of the *Pappas* complaint, allege "property damage" that is potentially covered under the Policies.

A brief review of the chronology of the *Pappas* litigation is necessary in order to address Liberty Mutual's motion with respect to the third and fourth (current) version of the *Pappas* complaint. Every version of the *Pappas* complaint includes specific factual allegations that Pella manufactured and sold defective windows that resulted in water entering and remaining behind the aluminum cladding, causing wood rot and deterioration to the windows themselves. As discussed above, the earlier versions also alleged specific facts relating to damage to the surrounding structure of the plaintiffs' homes as a result of water intrusion. However, these specific factual allegations with respect to the

---

water-related damage to the plaintiffs' windows, as well as (arguably, as discussed below) to the surrounding structures of the homes into which they were installed. In other words, both suits allege "physical injury to tangible property."

**3.** The Policies expressly exclude coverage for any property damage to "your product" and/or "your work." Def.'s App. at 37. "Your product" is defined to mean "[a]ny goods or products . . . manufactured, sold, handled, distributed, or disposed of by . . . You." *Id.* at 54. "Your work" is defined to mean "a. Work or operations performed by you or on your behalf; and b. Materials, parts, or equipment furnished in connection with such work or operations." *Id.*

**4.** Liberty Mutual did not respond to Pella's argument that the *Saltzman* complaint alleges potentially covered "property damage," instead arguing only that the suit does not allege an "occurrence."

**5.** For example, the *Saltzman* complaints explicitly allege that the latent defect in Pella's windows resulted in "premature wood rot and other physical damage to both the window and main structure" of the plaintiffs' homes. *See, e.g.,* First Am. Saltzman Compl. at ¶ 1. Likewise, the first three versions of the *Pappas* complaint specifically allege water-related damage to both the windows and the structure of the plaintiffs' homes resulting from the latent defect. *See, e.g.,* Pappas Am. Class Action Compl. at ¶¶ 10–12 (alleging that the defective windows "caused microbial contamination and damage to the surrounding wood frame and sheeting").

structure of the plaintiffs' homes were withdrawn in the third amended complaint and were again omitted in the present, fourth amended complaint. Liberty Mutual argues that the removal of these specific allegations of damage "makes it especially clear—perhaps more so than if damage to other property had never been alleged—that the *Pappas* plaintiffs do not allege property damage to property other than the windows themselves." Pl.'s Br. at 11 (Clerk's No. 96).

Pella concedes, as it must, that the specific factual allegations of property damage to the structure of the plaintiffs' homes were omitted from the third and fourth amended *Pappas* complaints. It points out, however, that the later versions of the complaint continue to seek an "award of consequential damages and actual damages sufficient to remediate and repair damage to Plaintiffs' and class members' homes which resulted from water intrusion."[6] Third Am. Pappas Compl. at 27; Fourth Am. Pappas Compl. at 16. Given the liberal construction of the underlying allegations required by Iowa law, Pella argues that the third and fourth (current) amended Pappas complaints "arguably or potentially" allege damage to property other than the windows themselves. *See* Def.'s Br. at 10 (Clerk's No. 108) (quoting *Employers Mut. Cas. Co. v. Cedar Rapids Television Co.*, 552 N.W.2d 639, 641 (Iowa 1996)).

The question is a close one. Courts that have considered the issue have rightfully been reluctant to find that an underlying lawsuit alleges covered damages based *solely* on a generally worded, all-encompassing prayer for relief, where specific factual allegations are lacking. *See, e.g., Martco Ltd. P'ship v. Wellons, Inc.*, No. 04–673, 2008 WL 5102295, at *4 (W.D.La. Dec. 1, 2008) (finding that "we cannot interpret a blanket prayer for 'any and all repair costs' to pertain to repairs for which coverage is provided, since, again, no such allegations exist within the remainder of the complaint."). The Court agrees with Pella, however, that given Iowa law, the underlying factual allegations—*i.e.* that Pella manufactured and sold defective windows that allowed water intrusion—coupled with the specific request for damages to repair and remediate damage to the structure of the plaintiffs' homes "as a result of water intrusion" is sufficient to "arguably or potentially bring the action within the policy coverage." *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 627 (Iowa 1991) (internal citation omitted).

### B. Whether the Underlying Lawsuits allege an "occurrence"

Both parties next seek a declaration on the issue of whether the Underlying Lawsuits allege an "occurrence." The disparity between the parties' positions centers on their respective views of what the Court's focus should be when addressing this issue. Liberty Mutual argues that the Court must focus on Pella's underlying conduct—that is, the allegedly fraudulent sale of defective windows, which Pella knew could result in damage. It contends that fraudulent conduct can never be an "accident" and accordingly argues that the

---

**6.** Liberty Mutual contends that this request for relief is itself ambiguous, arguing that it is unclear whether the request for an award of damages to repair the "class members' homes" is simply a request to compensate for damage to the plaintiffs' windows rather than damage to other parts of their homes. The Court is not persuaded by this argument, however, as the prayer for relief immediately above this one specifically requests either an order to replace the windows or, in the alternative, compensatory damages sufficient to pay for the replacement of the plaintiffs' windows, including the costs of labor and redecoration. *See* Fourth Am. Pappas Compl. at 16.

Underlying Lawsuits do not allege an "occurrence," regardless of whether Pella intended or expected any of the damage alleged to have been the result of its conduct.[7]

In contrast, Pella argues that the Court's focus must be on the underlying damages that are alleged, not simply on whether its conduct is alleged to have been intentional. Pella, in fact, concedes that the Underlying Lawsuits allege that it acted intentionally, in that it sold its windows with the knowledge that leakage *could* occur. However, it argues that the complaints do not allege that any of the resulting damages were "expected," as that term is defined under Iowa law; and, accordingly, a potential "occurrence" is alleged.[8] Pella contends that the fact that the Underlying Lawsuits assert claims of fraud is not particularly relevant, as courts are to focus on the underlying factual allegations, not the legal theories that a plaintiff chooses to invoke. *See Employers Mut.*, 552 N.W.2d at 641 ("[I]t is clear under Iowa law that an insurance company is to look at the *allegations of fact* in the third-party plaintiff's petition against the insured and *not* the legal theories on which the third-party claims insured is liable.").

As always, the Court begins by looking to the language of the Policies. The term "occurrence" is defined in the Policies as "an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions." Def.'s App. at 52 (emphasis added). The Policies do not, however, provide a definition for the term "accident." The Eighth Circuit has previously held that "[u]nder Iowa law, this language is unambiguous and disposi-

tive," as the Iowa Supreme Court has concluded,

> [W]hen the term "accident" is used in the definition of "occurrence," but left undefined in the policy, the ordinary meaning to be given the term is an undesigned, sudden, and unexpected event usually of an afflictive or unfortunate character and often accompanied by a manifestation of force ... we think ["accident"] clearly implies a misfortune with concomitant damage to a victim, not the [conduct] which eventually results in that misfortune.

*Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.*, 479 F.3d 949, 952 (8th Cir.2007) (quoting *Pursell Constr., Inc. v. Hawkeye–Security Ins. Co.*, 596 N.W.2d 67, 70 (Iowa 1999) (internal quotation omitted)). The term "expected," as used in insurance policies, has been defined in the case law to "denote [ ] that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions." *Weber v. IMT Ins. Co.*, 462 N.W.2d 283, 288–89 (Iowa 1990) (internal quotation omitted). "Substantial probability," however, "requires more than reasonable foreseeability." *Walnut Grove*, 479 F.3d at 955. "The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur." *Weber*, 462 N.W.2d at 289 (internal quotation omitted).

A closer look at the *Pursell* court's definition of the term "accident"—as an "unexpected event"—reveals that it does not refer merely to the *cause* of any resulting damages. Rather, it dictates that when

---

7.  Liberty Mutual argues, of course, that the Underlying Lawsuits do allege that Pella "expected" damage to result from its conduct.

8.  On this point, Pella argues that even if the Underlying Lawsuits allege that the damage

to the plaintiffs' windows themselves was "expected or intended," there is no allegation that it "expected or intended" damage to property *other* than the windows themselves.

determining whether an event is an "accident"—or in other words, "unexpected"—courts must give consideration to both the underlying causative factor(s) *and* the resulting damages. *See Pursell,* 596 N.W.2d at 70 (the term accident "implies a misfortune with concomitant damage to a victim"). This is implicit in the court's holding that "defective workmanship standing alone, *that is, resulting in damages only to the work product itself,* is not an occurrence under a CGL policy." *Id.* at 71 (emphasis added). Were the "accident" only the *cause* of the underlying event, it would be unnecessary for the Court to include any discussion of the resulting damages. That is not to say, as Pella implies, that an event is "unexpected" as long as *any* of the resulting damages were not expected by the insured.[9] Rather, the Court must look at the event as a whole, including the resulting damages, and determine whether it can be said to be an "accident."[10]

Although it predates *Pursell,* the Eighth Circuit's decision in *Ellensohn v. American Family Mutual Insurance Company,* 96 F.3d 1075 (8th Cir.1996), is consistent and instructive on this point. In that case, the court considered a dispute over insurance coverage for an underlying lawsuit in which a mentally disabled plaintiff had sued two defendants for intentional infliction of emotional distress, alleging that they tried to cheat him out of part of his soybean crop. *Id.* at 1075. The defendants asked their insurer to defend and indemnify them under their liability policies, which defined the term "occurrence" in the same way as the Liberty Mutual Policies. *Id.* The insurer denied coverage and refused to defend on the ground that the defendants' allegedly fraudulent conduct was not a covered "occurrence" under their policies. *Id.*

The defendants admitted that their conduct was not an "accident," as they intended injury to the plaintiff by attempting to defraud him. *Id.* at 1076. They contended, however, that they were entitled to coverage because they did not "intend or expect" to cause the specific injury (emotional distress) alleged by the plaintiff in his underlying lawsuit. *Id.* Interpreting Iowa law, the Eighth Circuit rejected the defendants' argument and affirmed the district court's decision that there was no covered "occurrence." *Id.*

Central to the court's decision was the fact that the term "occurrence" was defined only as an "accident." It distinguished the policy's definition of "occurrence" from that of policies in other cases, relied on by the defendants, where the term was defined in such a way that an "occurrence" may be present so long as the underlying conduct results in *any* bodily injury or property damage "neither expected nor intended from the standpoint of the insured." *Id.* (citing *First Newton Nat. Bank v. Gen. Cas. Co. of Wis.,* 426 N.W.2d 618, 625 (Iowa 1988), and *West Bend Mut. Ins. Co. v. Iowa Iron Works,*

---

9. To the contrary, courts have generally held that such an argument is without merit. *See Knapp v. Smiljanic,* 847 F.Supp. 1428, 1436–37 (W.D.Wis.1994) (noting that an insured "go[es] too far in arguing that [he] is covered if he commits an intentional act and expects to cause a given result as long as he does not intend to bring about the degree of harm that accompanies that result."); *Frankenmuth Mut. Ins. Co. v. Masters,* 460 Mich. 105, 595 N.W.2d 832, 839 (1999) (in instances where *some* injury was intended or expected, "liabil-

ity coverage should be denied, irrespective of whether the resulting injury is different from the injury intended.").

10. Or, as aptly stated by the Michigan Supreme Court, "the appropriate focus of the term 'accident' must be on both the injury-causing act or event and its relation to the resulting property damage or personal injury." *Masters,* 595 N.W.2d at 838 (interpreting Michigan law).

*Inc.*, 503 N.W.2d 596, 600–01 (Iowa 1993)). The court found that, given the policy language at issue, there was no "accident," as the defendants admitted that they acted with the intention of causing harm, regardless if other unintended or unexpected harm ultimately resulted. *Id.*

Also instructive is the Western District of Wisconsin's decision in *Knapp v. Smiljanic*, in which the court addressed an insured's motion for reconsideration of its earlier order granting the insurer's motion for summary judgment. *Knapp*, 847 F.Supp. at 1437 (interpreting Wisconsin law). At issue was insurance coverage for a policyholder who had refused an individual's application for an apartment because of her status as a Section 8 voucher recipient. *Id.* The insured conceded that its act of turning down the application was intentional; however, it argued that it did not intend or expect the resulting severe emotional distress that was claimed. *Id.* The policy at issue defined "occurrence" in the same way as the Liberty Mutual Policies—as an "accident." *Id.*

The court denied the insured's motion for reconsideration, holding that the insured's conduct in denying the plaintiff's rental application was not an "accident" under Wisconsin law. *Id.* It concluded by noting that

> Even if an "occurrence" can be an intentional act with unexpected results, [the insurer] would not be required to defend or indemnify defendants for the damages arising from their rejection of plaintiff's rental application. This is because defendants did intend the result of rejecting plaintiff's application: that she

would be unable to rent an apartment at Sun Valley. I do not understand defendants to be contending that they did not expect plaintiff to incur some damages as a result of the breach of their contractual duties to plaintiff. Indeed, defendants concede that it was foreseeable that plaintiff would suffer at least "minor, temporary annoyance" as a result of the rejection but not "[s]ignificant, long-term depression." The relevant fact is that defendants intended to prevent plaintiff from obtaining the apartment she wanted and would have expected that thwarting plaintiff in this way would cause her some harm, however minor.... It is immaterial whether defendant intended to cause plaintiff the degree of harm she claimed to have suffered.

*Id.*

These cases, and others like them, suggest that an event cannot be an "accident" if the insured "expected" that *some* harm would result from its actions, regardless the type of harm that actually resulted.[11] The "event," or misfortune suffered by the plaintiffs, at issue in the present case is the purchase of windows allegedly containing a latent defect, which ultimately manifested and resulted in damage. *See Pursell*, 596 N.W.2d at 70 ("we think ["accident"] clearly implies a misfortune with concomitant damage to a victim, not the [conduct] which eventually results in that misfortune."). The question before this Court is whether there is the potential, given the facts alleged, that this event was "unexpected," such that indemnity coverage under the Policies may ultimately be required. *See Employers Mut.*, 552

---

**11.** Even the case law relied on by Pella supports this interpretation. *See* Def.'s Br. at 23–24 (Clerk's No. 96) (citing *First Newton*, 426 N.W.2d at 625, and *West Bend*, 503 N.W.2d at 600–01). Take, for example, the Iowa Supreme Court's decision in *West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.* Although interpreting a definition of "occurrence" different from the Liberty Mutual Policies, the court held that an event is an " 'occurrence so long as the insured does not expect or intend both it and *some injury.*' " *West Bend*, 503 N.W.2d at 601 (emphasis added) (citing *First Newton*, 426 N.W.2d at 625).

N.W.2d at 641 (in assessing an insurer's obligations under a GCL policy, a court must determine whether there is "potential or possible liability to indemnify the insured based on the facts appearing at the outset of the case.").

There is no dispute that the Underlying Lawsuits clearly and unambiguously allege that Pella sold its windows with the knowledge of both the existence of the alleged defect, and that there was a *possibility* that the defect would result in damage.[12] *See* First Am. Saltzman Compl. at ¶¶ 11–17; Fourth Am. Pappas Compl. at ¶¶ 19–37. The Court finds, however, that the Underlying Lawsuits do not clearly and unambiguously allege that Pella "expected" this result, as that term is defined under Iowa law, such that Liberty Mutual has no potential duty to indemnify.

This is clear when one looks at the causes of action asserted by the plaintiffs under the Illinois Consumer Fraud Act. To establish Pella's liability under this statute, the Plaintiffs must prove (1) a "deceptive act or practice" by Pella; (2) Pella's intent that plaintiffs rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce." *Zekman v. Direct Am. Market-* *ers, Inc.*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853, 860 (1998) (citation omitted). The theory of liability alleged in the Underlying Lawsuits—that is, the knowing omission or concealment of a "material fact"—constitutes a deceptive act or practice under the statute. *Id.* To establish the presence of a "material fact" under Illinois law, the Plaintiffs need only establish that "a buyer of a product would have acted differently if it had known about the allegedly omitted information, or ... that [the omitted] information is the kind a buyer would be expected to rely on in deciding whether to purchase the product." *Pappas v. Pella Corp.*, 363 Ill. App.3d 795, 300 Ill.Dec. 552, 844 N.E.2d 995, 1001 (2006).

The "material fact" that the Plaintiffs allege Pella knowingly concealed or omitted is that its windows contained a latent defect, which it knew could possibly result in damage. While the factual allegations suggest that Pella's expectations as to the likelihood that the defect would result in damage went beyond mere foreseeability, it is not clear they allege that Pella "knew or should have known that there was a *substantial probability* that certain consequences will result from [its] actions." [13]

---

12. Indeed, the plaintiffs in the Underlying Lawsuits cannot prevail under the theories of liability asserted without demonstrating that Pella knew the defect existed. It is an element of both common-law fraud (asserted only in the *Saltzman* suit) and consumer fraud under the Illinois Consumer Fraud Act (asserted in both of the Underlying Lawsuits) that the omission or concealment be done *knowingly*. *See Fox v. Heimann*, 375 Ill. App.3d 35, 313 Ill.Dec. 366, 872 N.E.2d 126, 138 (2007) (an element of common-law fraud is that "the defendants intentionally made a false statement of material fact or failed to disclose a material fact"); *Addison v. Distinctive Homes, Ltd.*, 359 Ill.App.3d 997, 296 Ill. Dec. 673, 836 N.E.2d 88, 92 (2005) (where a plaintiff's cause of action rests on the allegation that the defendant concealed or omitted a material fact, he "must [prove] that the fact

omitted or concealed was known to the defendant at the time of the concealment.").

13. For example, the *Saltzman* suit alleges that Pella knew that there was a "substantial risk that its aluminum clad windows would leak and would have wood rot." First Am. Saltzman Compl. at ¶ 12. In a similar fashion, the *Pappas* suit alleges that Pella knew that the defect "would allow water to enter the space between the aluminum cladding and the wooden sash," and that "water could damage the wooden sash." Fourth Am. Pappas Compl. at ¶¶ 32, 35. Such facts, if proven at trial, would likely go well beyond showing that the manifestation of the latent defect with resulting damages was merely "reasonably foreseeable." *Walnut Grove*, 479 F.3d at 955 (A finding of "substantial probability," under Iowa law, requires "more than reasonable

*Weber,* 462 N.W.2d at 288–89 (emphasis added) (internal quotation omitted). Indeed, under the standard for materiality set forth above, the jury in either of the Underlying Lawsuits may find it "material" that Pella knew that there was merely a *possibility* that such an event would occur. Pella could thus conceivably be found liable, yet the evidence would fall short of establishing that it "expected" the misfortune allegedly suffered by the Plaintiffs. In other words, the possibility exists that Pella could ultimately be found liable for damage that was caused by an "occurrence."

Given the facts alleged, such a scenario may seem unlikely. The Court is not tasked, however, with making such a prediction. An insurer's duty to defend (or in this case, duty to reimburse defense costs) is triggered if the underlying complaint(s) contain allegations "that arguably or potentially bring the action within the policy coverage." *Employers Mut.,* 552 N.W.2d at 641. Under controlling Iowa law, "[i]f any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action. In case of doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the insured." *Id.* Given this standard, the Court finds that the facts set forth in the Underlying Lawsuits, if proven, could potentially constitute an "occurrence." [14]

## C. Whether the Underlying Lawsuits allege "property damage" potentially occurring during the period covered by the Policies

■ Pella next seeks a declaration that the Underlying Lawsuits allege "property damage" that was potentially occurring during the period covered by the Policies. As discussed above, Liberty Mutual contends that the *Pappas* suit (at the time of the third amended complaint and thereafter) does not allege "property damage" at all. It offers no additional argument, however, that the Underlying Lawsuits do not allege "property damage" that was occurring during the time period covered by the Policies.

■ The "Insuring Agreement" contained in each of the Policies expressly states that coverage only extends to " 'property damage' which occurs during the policy period." Def.'s App. at 34. Under Iowa law, property damage is deemed to occur at the time that the underlying claimant sustained or allegedly sustained any injury or damage. *See First Newton,* 426 N.W.2d at 623–24 (affirming district court's determination that policies were triggered where the underlying petition alleged that damage was sustained during the policy period). Successive policies may be triggered as long as the factual allegations contained in the underlying complaint permit a finding of continuing damage. *Gen. Cas. Ins. Co. of Wis. v. Penn–*

foreseeability."). While a surgical distinction, to be sure, the Court must conclude the fact that Pella knew that there was a "substantial risk," or that damages "could occur," does not, however, establish under the applicable law that Pella was "forewarn[ed] . . . that the results are highly likely to occur," which is the requirement of finding a "substantial probability." *Weber,* 462 N.W.2d at 289 (internal quotation omitted).

14. Liberty Mutual also argues that coverage is precluded for the third and fourth (current) versions of the *Pappas* suit because the only

"property damage" alleged is to the windows themselves. It relies on *Pursell* for the proposition that, under Iowa law, a claim for defective workmanship that results in damage *only* to the insured's work product itself is not an "occurrence." *See Pursell,* 596 N.W.2d at 71 (holding that "defective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."). Given the Court's earlier holding that these later versions of the *Pappas* complaint allege damage to property other than the windows themselves, this argument fails.

*Co Constr., Inc.,* No. C03–2031–MWB, 2005 WL 503927, at \*15 (N.D.Iowa March 2, 2005).

In the context of the present case, the *Saltzman* suit seeks damages on behalf of all individuals who purchased Pella windows at various times, beginning as early as 1990. In addition, it contains specific allegations of damage to the various named plaintiffs that arguably span the entire time period covered by the Policies.[15] Likewise, the *Pappas* suit seeks damages on behalf of all individuals who purchased Pella windows at various times, beginning in approximately 1990. It also contains allegations of continuing damage to the plaintiffs caused by the latent defect. Under the standards set forth above, the Court finds that both of the Underlying Lawsuits allege "property damage" that was potentially occurring during the entire time period covered by the Policies.

**D. Whether Pella has satisfied the "Self–Insured Amount" necessary to trigger Liberty Mutual's defense obligation**

Pella finally seeks a declaration that it has satisfied any "Self–Insured Amount" necessary to trigger Liberty Mutual's duty to reimburse its defense costs. It argues that the Underlying Lawsuits allege "property damage" caused by the same, single "occurrence," and that its defense expenses incurred to date are in excess of the respective "Self–Insured Amounts" set forth in any of the Policies. Liberty Mutual argues that an issue of material fact exists on the question of whether the Underlying Lawsuits allege a single "occurrence," and accordingly, summary judgment is inappropriate.[16]

**1. Whether the Underlying Lawsuits allege a single "occurrence"**

■ Since the Policies provide coverage on a "per-occurrence" basis, it is first necessary to determine whether the damages sought by the plaintiffs in the Underlying Lawsuits are alleged to have arisen out of a single "occurrence." Liberty Mutual argues (and Pella concedes) that there are no cases that provide specific guidance under Iowa law on how to determine the number of "occurrences" alleged in an underlying suit. The majority of courts, however, appear to answer this question based on the "underlying cause" of the property damage alleged. *See, e.g., Chemstar, Inc. v. Liberty Mut. Ins. Co.,* 797 F.Supp. 1541, 1546 (C.D.Cal.1992).[17]

---

**15.** By way of example, the complaint alleges that named plaintiff Kevin Eubank built his home with Pella windows in 1992, and discovered water-related damage to the sashes of his windows in 2006. First Am. Saltzman Compl. at ¶¶ 28–32. It also alleges that named plaintiff Thomas Riva had his Pella windows installed in 2001 and discovered water-related damage to his windows and the main structure of his home in 2004. *Id.* at ¶¶ 35, 38.

**16.** Liberty Mutual also restates its earlier argument that it has no duty to reimburse Pella's defense costs so long as those costs are being paid, or are payable by "other insurance." *See* Pl.'s August 6, 2008, Mot. for Partial Summ. J. (Clerk's No. 60). In the interim, this Court found against Liberty Mutual on that issue in the Court's May 15, 2009, Order, and it will not be revisited here.

**17.** *See also Colonial Gas Co. v. Aetna Cas. & Sur. Co.,* 823 F.Supp. 975, 983 (D.Mass.1993) (holding that "consistent with the rule in the majority of states, ... the number of occurrences turns on the underlying cause of the property damage, and where, as here, there is a single cause ... there is a single occurrence."); *Mich. Chem. Corp. v. Am. Home Assur. Co.,* 728 F.2d 374, 379 (6th Cir.1984) ("The vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims."); *Owens–Illinois, Inc. v. Aetna Cas. and Sur. Co.,* 597 F.Supp. 1515, 1525 (D.D.C.1984) (citing *Mich. Chem.,* 728 F.2d at 379–80).

Under this majority approach, "the calculation of the number of occurrences must focus on the underlying circumstances which resulted in the personal injury and claims for damage rather than each individual claimant's injury." *Owens–Illinois, Inc. v. Aetna Cas. and Sur. Co.*, 597 F.Supp. 1515, 1525 (D.D.C.1984).

In spite of the lack of guidance under Iowa law, the Court finds that the application of the majority approach to the present case is prudent and is supported by the language of the Policies. For example, the term "occurrence" is broadly defined in the Polices to include "the continuous or repeated exposure to *the same general harmful conditions*." Def.'s App. at 52 (emphasis added). Under this definition, it is clear that the question of the number of "occurrences" is answered by focusing on the *cause* of the damages alleged, much like the majority approach discussed above. Thus, where damages are alleged to have been the result of "continuous or repeated exposure" to harmful conditions, the Court must ask whether the conditions that caused the damages were the "same." If the answer is yes, then a single "occurrence" is alleged.[18]

In the present case, the Court agrees with Pella that the damages alleged by each of the plaintiffs in the Underlying Lawsuits arise from the "the continuous or repeated exposure to the same general harmful conditions"—that is, to the design, manufacture, and allegedly fraudulent sale of a product containing the same latent defect. Accordingly, the Court finds that the Underlying Lawsuits allege damages arising from a single "occurrence."

### 2. Whether Pella has satisfied the "Self–Insured Amount"

■ Under the terms of the Policies, Liberty Mutual has a duty to reimburse Pella for costs incurred in defending a potentially covered "occurrence," when they are in "excess" of the "Self–Insured Amount." Def.'s App. at 33. Given the Court's findings above—that is, that the Underlying Lawsuits allege potentially covered "property damage" (caused by a single "occurrence") that was occurring throughout the time period covered by the Policies—indemnity coverage for the Underlying Lawsuits potentially exists under *each* of the Policies. Thus, Liberty Mutual's duty to reimburse Pella's defense costs is triggered when Pella's defense expenditures exceed the "Self–Insured Amount" set forth in *any* of the Policies. *See Employers Mut.*, 552 N.W.2d at 641 (an insurer's defense obligations are triggered if the allegations "arguably or potentially bring the action within the policy coverage.").

The "Self–Insured Amounts" set forth in the various Policies range from $100,000 to $1–million per "occurrence." Pella has presented evidence that it has incurred defense expenses well in excess of $1–million. *See* DeMeulenaere Decl., Def.'s App. at 1635. Indeed, it appears clear that Pella's defense costs, whatever the precise total, have exceeded each of the respective "Self–Insured Amounts."[19]

---

18. The policy language also suggests that misfortunes suffered by a number of different claimants can constitute the same "occurrence," provided that the cause of their respective harms was exposure to the "same general harmful conditions." Indeed, the Policies' "Limits of Insurance" provision provides that coverage extends to "*all* ... 'property damage' arising out of any *one* 'occurrence.' " Def.'s App. at 43 (emphasis added). Furthermore, implicit in the very definition of "occurrence" is that the event can be ongoing ("the *continuous or repeated* exposure") over a period of time.

19. For example, an August 14, 2003, email from Liberty Mutual's claims examiner to Pella's attorney indicated that it was his belief that Pella had already incurred expenses defending the *Pappas* suit totaling $453,219.30. Def.'s Statement of Material Facts at ¶ 59 (Clerk's No. 94).

Liberty Mutual responds, however, that it does not have information sufficient to verify the actual expenses that Pella has incurred. Under the terms of the Policies, its defense obligations are subject to the requirement in the Policies that Pella "shall maintain adequate records and supporting data for any reimbursement of 'Allocated Loss Adjustment Expense' due from [Liberty Mutual]." *See, e.g.,* Def.'s App. at 33.

Although technically the current state of the record may leave an issue of fact as to the amount Pella has *actually* expended in defending the Underlying Lawsuits, the Court finds it is not material for the purposes of the present motions. The fighting issue at this stage is at what point Liberty Mutual's defense obligation is triggered, *not* whether Pella has maintained and presented adequate records and supporting data.[20] As set forth above, the Court holds that Liberty Mutual's duty to reimburse Pella's defense costs under the Policies is triggered once those costs are in excess of the "Self–Insured Amount" set forth in the Declarations in *any* of the respective Policies, subject to the requirements under the Policies with respect to proof.[21]

### E. Whether Pella's fifth counterclaim presents an "actual controversy" for this Court to resolve

■ Liberty Mutual also moves for partial summary judgment with respect to Pella's fifth cause of action in its First Amended Counterclaims, arguing that there is no "actual controversy" to resolve by way of declaratory relief.[22] Pella's fifth cause of action relates to Liberty Mutual's potential obligations with respect to one or more of the "Basket Aggregate Policies" that Pella purchased from Liberty Mutual and seeks a declaration of Liberty Mutual's obligations under these policies depending on the resolution of several of the various other legal issues raised in the parties' motions and addressed earlier in this Order.[23]

A brief factual background is in order. In addition to the underlying GCL Policies at issue, Pella also purchased annual "Basket Aggregate Policies" (BAPs) from Liberty Mutual covering the periods of September 1, 2002, through September 1, 2006. The BAPs provide that Liberty Mutual

[W]ill indemnify [Pella] for all Payment Amounts that exceed the Insured's Retention but not for more than the Insur-

---

**20.** On this point, Pella attacks Liberty Mutual's assertion that it does not have sufficient information to verify its expenses, arguing that Liberty Mutual has been provided with copies of all of its invoices. Def.'s Br. at 5, n. 4 (Clerk's No. 114).

**21.** Given this holding, the Court trusts that the parties can resolve the issue of whether Pella's defense costs incurred in defending the Underlying Lawsuits *to this point* exceed the "Self–Insured Amount" in any of the Policies, and the extent of any excess.

**22.** Pella has subsequently filed its Second Amended Counterclaims. *See* Def.'s Second Am. Countercl. (Clerk's No. 122). The fifth cause of action included in both the First and

Second Amended Counterclaims are identical in all material respects. The Court will, thus, address Liberty Mutual's motion as pertaining to Pella's Second Amended Counterclaims.

**23.** Specifically, Pella's fifth counterclaim seeks the following relief:

Depending on the resolution of various legal issues with respect to its insurance and/or the amount of payments made by Pella for damages and allocated loss adjustment expense falling within the insured's deductible and/or self-insured retention under certain insurance policies, Pella seeks a declaration from this Court as to Liberty Mutual's obligations to Pella under the Basket Aggregate Policies.

Def.'s Second Am. Countercl. at ¶ 102.

er's Aggregate Limit of Liability stated in Item 5 of the Information Page.

Pl.'s App. at 3 (Clerk's No. 98). The term "Payment Amounts" is defined to mean "[a]ll payments for damages or allocated loss adjustment expenses falling within [Pella's] deductible and/or self insured retention" paid by Pella under the underlying GCL Policies. *Id.* at 5. The "Insured's Retention" is an amount set forth in the respective "Insured's Retention Endorsement," ranging from $4,000,000 to $5,600,000. *See, e.g., id.* at 3. The purpose of these additional policies was to provide Pella with a cap to the total aggregate amount (the "Insured's Retention") that it would have to pay toward *all* deductibles and/or self-insured retentions under its GCL policies during a particular policy period, *regardless* of the number of "occurrences" that took place.

"Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equip. Mgmt. Co. v. U.S.*, 4 F.3d 643, 646 (8th Cir.1993) (citations omitted). "The case or controversy requirement of Article III applies with equal force to actions for declaratory judgment as it does to actions seeking traditional coercive relief." *Id.* (citation omitted). The test to determine whether there is an "actual controversy" within the meaning of the Declaratory Judgment Act is whether "there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (internal quotation omitted).

Given the Court's holding above that the Underlying Lawsuits allege damages aris-

ing from a single "occurrence," there is simply no indication that the BAPs will ever be implicated such that a "substantial controversy" can be said to exist between the parties on this issue. Because the Underlying Lawsuits allege a single "occurrence," Pella need only satisfy one "deductible and/or self insured retention" (or "Self–Insured Amount") before Liberty Mutual's defense obligations are triggered under the respective GCL Policies. Thus, regardless of the amount Pella incurs in defense, settlement, or judgment costs in connection with the Underlying Lawsuits, the most that may qualify as "Payment Amounts" under the BAPs would be the largest "Self–Insured Amount" contained in any of the GCL Policies—$1–million.[24] Accordingly, the Court finds that there is no "substantial controversy" between the parties with respect to Pella's fifth counterclaim.

## III. CONCLUSION

For the foregoing reasons, the Court holds as follows:

1. Liberty Mutual's motion for partial summary judgment in the form of a declaration that there is no potential coverage for the Underlying Lawsuits under the Policies (Clerk's No. 96) must be **denied.**

2. Pella's motion for partial summary judgment in the form of a declaration that the Underlying Lawsuits allege claims that are potentially covered under the Policies (Clerk's No. 104) must be **granted.**

3. Pella's motion for partial summary judgment in the form of a declaration that the Underlying Lawsuits allege "property damage" arising

**24.** The potential exists, of course, that Pella could have paid a number of "deductible and/or self insured retentions" with respect to other "occurrences" unrelated to the Under-

lying Lawsuits, thus implicating the BAPs. There is, however, no record herein to assess such implications.

out of a single "occurrence" (Clerk's No. 104) must be **granted.**

4. Subject to the requirements under the Policies with respect to proof and as limited in the Court's Order, Pella's motion for partial summary judgment in the form of a declaration that Pella has satisfied any self-insured retention applicable to the Underlying Lawsuits, and that Liberty Mutual's duty to reimburse Pella's defense costs under the Policies has been triggered (Clerk's No. 104) must be **granted.**

5. Liberty Mutual's motion for partial summary judgment dismissing the fifth cause of action in Pella's Seconded Amended Counterclaims for failure to state an "actual controversy" (Clerk's No. 97) must be **granted.**

**IT IS SO ORDERED.**