**PELLA CORPORATION, Pella Windows and Doors, Inc, and Pella Windows and Doors of Ontario Corp., Plaintiffs,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

**Liberty Mutual Insurance Company, Third–Party Plaintiff,**

v.

**Pella Corporation and Pella Windows and Doors of Ontario Corp., Third–Party Defendants.**

No. 4:11–cv–00273–JEG

United States District Court, S.D. Iowa, Central Division.

Signed 03/31/2017

Burt M. Garson, KASOWITZ BENSON TORRES & FRIEDMAN LLP, Adam S Ziffer, Kenneth H Frenchman, Marc Thomas Ladd, John P Winsbro, Keith McKenna, Robin L Cohen, NEW YORK, NY, Richard W Lozier, Jr., BELIN McCORMICK, P.C., DES MOINES, IA, for Plaintiffs.

Maryanne B Foster, Charles W Browning, Jeffrey C Gerish, Kenneth C. Newa, Lauren Beth McMillen, Bloomfield Hills, MI, Robert VP Waterman, Jr, LANE & WATERMAN LLP, DAVENPORT, IA, Shannon L. H. Phillips, COLLINS EINHORN FARRELL PC, SOUTHFIELD, MI, for Defendant.

Maryanne B Foster, Charles W Browning, Jeffrey C Gerish, Kenneth C. Newa, Bloomfield Hills, MI, Robert VP Waterman, Jr, LANE & WATERMAN LLP, DAVENPORT, IA, Shannon L. H. Phillips, COLLINS EINHORN FARRELL PC, SOUTHFIELD, MI, for Third–Party Plaintiff.

Burt M. Garson, KASOWITZ BENSON TORRES & FRIEDMAN LLP, Adam S

Ziffer, Kenneth H Frenchman, Marc Thomas Ladd, NEW YORK, NY, Richard W Lozier, Jr., BELIN McCORMICK, P.C., DES MOINES, IA, for Third–Party Defendants.

## ORDER

JAMES E. GRITZNER, Senior Judge

This matter comes before the court on a motion for partial summary judgment filed by Plaintiffs Pella Corporation, Pella Windows and Doors of Ontario Corporation, and Pella Windows and Doors, Inc. (collectively, Pella). Defendant Liberty Mutual Insurance Company (Liberty) resists. A hearing on the Motion was held on February 15, 2017. Attorneys Keith McKenna, Marc Ladd, and Richard Lozier were present on behalf of Pella, and attorneys Charles Browning, Jeffrey Gerish, and Bob Waterman were present on behalf of Liberty. The matter is fully submitted and ready for disposition.

## I. BACKGROUND [1]

### A. Overview

Pella purchased annual liability insurance policies from Liberty covering the years between 2000 and 2008. These insurance policies fell under two categories. Comprehensive general liability policies (CGL Policies) insured Pella for certain damages and costs, including defense costs, subject to deductibles called self-insured retentions (SIRs). "Aggregate SIR Policies," also referred to as "Excess Indemnity Policies," offered coverage for payment of SIRs under each of the GCL Policies, subject to a separate deductible called "Insured's Retentions."

The CGL Policies cover damages and defense costs in excess of an SIR where there is "personal injury" or "property damage" caused by an "occurrence" during the policy period (as defined in the CGL Policies). Pella App. 595, ECF No. 173–1. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Pella App. 613. Where several "occurrences" are triggered under the same CGL Policy, Pella is subject to the policy's SIR with respect to each occurrence, and this application of the SIR may trigger coverage under the Aggregate SIR Policies.

In the present action, Pella seeks reimbursement of certain expenses incurred in defending against and resolving (by settlement or damage awards) various claims against Pella. Because there are many disputed underlying lawsuits against Pella, the litigation focuses on fifteen of the highest value claims (the Sample Claims). The Sample Claims generally alleged that Pella's windows were defectively designed, manufactured, or installed, and allowed water intrusion to buildings that resulted in third-party property damage or personal injury.

The parties have made a number of summary judgment motions bearing on disputed issues in this litigation, a few of which this Court has already resolved. This Court has held that the Sample Claims alleged property damage caused by an occurrence and thus triggered Liberty's defense coverage obligation under the CGL Policies. ECF No. 222; see also Pella Corp. v. Liberty Mut. Ins. Co., No. 4:11–cv–000473–JEG, 221 F.Supp.3d 1107, 1131,

---

1. The facts here are either materially undisputed or, if genuinely disputed, viewed in the light most favorable to the nonmoving party.

See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).

2016 WL 6514171, at *20 (S.D. Iowa Nov. 1, 2016). Specifically, this Court found that claims based on allegations of defective design or workmanship, including those seeking damages due to negligence, may give rise to an "accident" as that term is used in the definition of "occurrence." This Court observed that under Iowa law, the alleged tortious conduct that gives rise to a claim is not an occurrence, but the resulting damage-causing misfortune may be. In Decker Plastics Inc. v. West Bend Mutual Insurance Co., 833 F.3d 986, 988 (8th Cir. 2016), the alleged occurrence consisted of the deterioration of plastic landscaping bags manufactured by the insured, where the insured faced claims that it failed to properly manufacture the bags after the allegedly defective bags caused other property damage. Id. at 988. Applying Decker Plastics to the present case, this Court held that "claims of defective workmanship manifesting in water intrusion ... include the allegations of an accident—namely, unexpected and unintended water intrusion—and thus support the finding of an 'occurrence.'" Pella Corp., 221 F.Supp.3d at 1126, 2016 WL 6514171, at *16.[2]

Separately, this Court, addressing motions filed by both parties, has also held that the pro rata method of allocation applies to the CGL Policies where one occurrence causes damage that triggers multiple policy periods. ECF No. 228. Also pending before the Court is a motion by Pella for a declaration that costs incurred for settlements and judgments in connection with the Sample Claims are covered under the CGL Policies, ECF No. 170, and a motion by Liberty to dismiss claims by Pella relating to Aggregate SIR Policies from 2002–2008, ECF No. 117.

The Motion addressed in this Order raises the question of how many occurrences the Sample Claims present. Pella, in its Motion for Summary Judgment on the Number of Occurrences at Issue in the Sample Claims, ECF No. 171, seeks a declaration that each of the fifteen Sample Claims presents one "occurrence" as that term is defined in the CGL Policies. Pella also argues that even if the Sample Claims do not present separate occurrences as a matter of law, summary judgment is nevertheless appropriate on estoppel grounds because Liberty treated each Sample Claim as a separate occurrence when processing them. Liberty resists the Motion, arguing that the Sample Claims set forth either three or four occurrences at most, and also that summary judgment is improper because Pella should be estopped from arguing that the Sample Claims present separate occurrences after taking a contrary position in prior litigation before this Court.

## B. The Sample Claims

The basic facts regarding the underlying Sample Claims have been summarized in this Court's prior order dated November 1, 2016. ECF No. 222; see also Pella Corp., 221 F.Supp.3d at 1110–14, 2016 WL 6514171, at *2–5. This Motion implicates additional facts in the record on summary judgment, including the allegations made by the various plaintiffs in the Sample Claims and facts observed by Pella or other experts in its investigations of the claims.

---

**2.** As noted in the prior Order, the Court reached this same result under applicable Iowa law in addition to following Decker Plastics. Pella Corp., 221 F.Supp.3d at 1125 n.8, 2016 WL 6514171 at *14 n.8.

*The 464 Prospect Claim.*[3] The 464 Prospect Claim sought damages allegedly caused by Pella products installed at two buildings in La Jolla, California. The Pella products at issue were Architect Series aluminum-clad windows and hinged and sliding doors. These products were manufactured in Pella, Iowa, in 1999 and 2000, and in Sioux Center, Iowa in 2003. Noted or alleged defects included: glazing leaks at window sashes, frame corners, cranks, latches, and hinge hardware; gaps in weather-stripping material; water penetration under door thresholds; leaks at horizontal mullions between connected windows and doors; and leaks in "peel and stick" barriers surrounding windows. Pella tendered the 464 Prospect Claim to Liberty on January 16, 2006.

*The Diamantis Claim.*[4] The Diamantis Claim sought damages allegedly caused by Pella products installed at a home and pool house in Madison, Alabama. The Pella products at issue were Architect Series casement windows and hinged doors, ProLine Series sliding windows, and Clad Frame support products. These products and replacements that Pella issued were manufactured in 1994–1996 and 2000, respectively. Defects that were noted or alleged included a leaking mullion joint for a circle head window, glazing leaks, mullion assembly leaks, loose weatherstripping, and leaking bases of patio doors. Pella tendered the Diamantis Claim to Liberty on October 17, 2008.

*The Eakins Claim.*[5] The Eakins Claim sought damages allegedly caused by Pella products to a home in Wilmington, North Carolina, on behalf of a class of similarly situated North Carolina customers. The Pella products at issue were Designer Series Smart Sash II windows that were manufactured in 2000. The plaintiffs alleged defects including: gaps in weather-stripping material; leaks at window sashes, frame corners, and sash corners; and unsloped sills leading to water trapped behind weatherstripping.

*The G.T. Leach Claim.*[6] The G.T. Leach Claim sought damages allegedly caused by Pella products to a condominium complex in Houston, Texas. The Pella products at issue were ProLine Casement and Clad Frame windows that were manufactured in 2001. The plaintiffs alleged defects including: gaps on vent frames caused by snap-on cladding, leaking vertical mullion joints, and leaks due to missing "peel and stick" tape on horizontal supports. Pella tendered the G.T. Leach Claim to Liberty on August 8, 2007.

*The Kaslly Claim.*[7] The Kaslly Claim sought damages allegedly caused by Pella products to a home in Henderson, Nevada. The Pella products at issue were Architect Series Classic casement windows and hinged doors that were manufactured in 2002. Defects noted or alleged included leaks at door hardware (such as latches),

**3.** 464 Prospect—La Jolla Homeowners Ass'n v. DTC–RECP OPCO, LLC, Case No. GIC842100 (Cal. Super. Ct., San Diego Cty.) (the 464 Prospect Claim).

**4.** Diamantis v. Pella Corp., No. CV–08–900963–GWN (Ala. Cir. Ct., Madison Cty.) (the Diamantis Claim).

**5.** Eakins v. Pella Corp., No. 05–5CVS–5CV–4696 (N.C. Super. Ct. Div., New Hanover Cty.) (the Eakins Claim); (7:05–CV–224–B)(2).

**6.** G.T. Leach Constr., Inc. v. Pella Corp., No. 2009–11158 (Tex. Dist. Ct., Harris Cty., 334 Jud. Dist.) (the G.T. Leach Claim).

**7.** Kaslly Family Revocable Tr. v. Distinctive Gen. Contracting Inc., No. A507598 (Nev. Dist. Ct., Clark Cty.) (the Kaslly Claim).

improper sealant application at door thresholds, and loose exterior cladding at windows. Pella tendered the <u>Kaslly</u> Claim to Liberty on July 29, 2008.

*The <u>Leal</u> Claim.*[8] The <u>Leal</u> Claim sought damages allegedly caused by Pella products to a home in Mission, Texas. The Pella products at issue were ProLine Double Hung windows that were manufactured in 1995. The plaintiffs alleged that the windows were improperly manufactured and that Pella negligently supervised their installation. Defects observed included various manufacturing defects in the windows as well as installation of the windows without proper flashing. Pella tendered the <u>Leal</u> Claim to Liberty on March 15, 2005.

*The <u>London Bay</u> Claim.*[9] The <u>London Bay</u> Claim sought damages allegedly caused by Pella products to a home in Naples, Florida. The Pella products at issue were Architect Series fixed clad frame windows that were manufactured in 2000. Defects noted or alleged included improperly sealed windows and sashes, leaks in weather-stripping attachments, mullion covers of incorrect length for mulled windows, and leaks in windows within fixed sidelight door panels.

*The <u>Marseilles</u> Claim.*[10] The <u>Marseilles</u> Claim sought damages allegedly caused by Pella products to a condominium complex in New Orleans, Louisiana. The Pella products at issue were Designer Series fixed-clad windows, French doors, and sliding patio doors. Though all products were manufactured in 2000, the windows and French doors were manufactured in different facilities. Defects noted or alleged included defective glazing seals and leaks at the head of clad-frame assemblies, at window/frame intersections and window perimeters, at patio door assemblies, and at the corners and thresholds of some doors. Through its experts, the plaintiffs offered multiple theories to explain these defects, including defective sealant, improperly placed sealant, faulty design (in that windows were overly reliant on sealant to prevent water intrusion), faulty on-site sealant repairs, and negligence in selecting the products at issue for the location in question. Pella tendered the <u>Marseilles</u> Claim to Liberty on March 13, 2007.

*The <u>Morse</u> Claim.*[11] The <u>Morse</u> Claim sought damages allegedly caused by Pella products to a home in Columbus, Nebraska. The Pella products at issue were Architect Series and Designer Series, and Clad Frame fixed sash windows, Architect Series and Designer Series windows with operable ashes, Architect Series and Designer Series double French doors, and an Architect Series single French door, all of which were manufactured in 2001. The plaintiff alleged defects including: leaking between the glass and internal muntin grid for windows, leaking through holes drilled into the windows for a security system, and leaking between and under French doors. The damage from water intrusion allegedly triggered a ceiling collapse. Pella tendered the <u>Morse</u> Claim to Liberty on August 26, 2008.

8. <u>Leal v. Am. Nat'l Lloyd's Ins. Co.</u>, No. CL–38, 608–A (Tex. Cty. Ct., Hidalgo Cty.) (the <u>Leal</u> Claim).

9. <u>London Bay Constr., Inc. v. Pella Windows & Doors of Fla., Inc.</u>, No. 06–1048–CA (Fla. Cir. Ct., Collier Cty.) (the <u>London Bay</u> Claim).

10. <u>Marseilles Homeowners Condo. Ass'n v. Broadmoor, LLC</u>, No. 2003–728 (La. Civ. Dist. Ct., Parish of Orleans) (the <u>Marseilles</u> Claim).

11. <u>Morse v. Sec. Equip., Inc.</u>, No. CI08–461 (Neb. Dist. Ct., Platte Cty.) (the <u>Morse</u> Claim).

*The Newland Claim.*[12] The Newland Claim sought damages allegedly caused by Pella products to a golf course clubhouse in Round Rock, Texas. The Pella products at issue were Clad Fixed Frame and Circlehead windows. The plaintiffs alleged that the windows used defective sealant and also deficiently repaired the windows on several occasions. Pella tendered the Newland Claim to Liberty on June 22, 2004.

*The Padovano Claim.*[13] The Padovano Claim sought damages allegedly caused by a Pella window to a window washer. The plaintiff was cleaning a Pella Architect Series double hung window, which was manufactured in 1996, when he fell through the window, suffering bodily injury. The plaintiff alleged that the center pivoting design of the window was defective and that warnings on the window were inadequate. Pella tendered the Padovano Claim to Liberty on March 25, 2004.

*The Palmetto Claim.*[14] The Palmetto Claim sought damages allegedly caused by Pella products to an electric power facility in Hardeeville, South Carolina. The Pella products at issue were Architect Series Casement, Clad Frame, and Double Hung windows and Architect Series and Commercial doors that were manufactured in 2000. The various windows were manufactured in 2000 in different locations. At least four defects were noted or alleged, including use of improper materials that

would not resist deterioration, leaks at certain window components and under door thresholds, and gaps in window corners. Pella tendered the Palmetto Claim to Liberty on March 9, 2010.

*The Pappas Claim.*[15] The Pappas Claim sought damages allegedly caused by Pella products to a single family home in Prospect Heights, Illinois, on behalf of a class of Pella customers in Illinois. The Pella products at issue for the named plaintiffs were Architectural Series windows. The plaintiffs alleged that the windows contained an upward facing seam in the widows that allowed water entry. Windows with this upward facing seam were manufactured between 1991 and January 1999. The original complaints in Pappas alleged both strict liability and negligence; later, the complaint was amended to allege only a single claim for consumer fraud. Pella tendered the Pappas Claim to Liberty, along with another claim, on May 8, 2003.

*The Parkloft Claim.*[16] The Parkloft Claim sought damages allegedly caused by Pella products to a condominium complex in San Diego, California. The Pella products at issue included Designer Series awning windows, casement windows, inswing patio doors, and clad frame support products that were manufactured in 2001. The plaintiffs alleged defects in the products' design, installation, and manufacture, including: weatherstripping defects at sash perimeters of windows; leaks in vents

---

12. Newland Cmtys. Texas L.P. v. Flynn Constr., Inc., No. GN 401840 (Tex. Dist. Ct., Travis Cty.) (the Newland Claim).

13. Padovano v. Desai Chia, Inc., No. 10217/04 (N.Y. Sup. Ct., Richmond Cty.) (the Padovano Claim).

14. Palmetto Elec. Coop., Inc. v. LS3P Assocs. Ltd., No. 07–CP–27–020 (S.C. Ct. of Common Pleas, Jasper Cty.) (the Palmetto Claim).

15. Pappas v. Pella Corp., No. 02–L–14558 (Ill. Cir. Ct., Cook Cty.) (the Pappas Claim).

16. Parkloft Condo. Owners Ass'n v. Parkloft, LLC, No. 88097 (Cal. Super. Ct., San Diego Cty.) (the Parkloft Claim).

in the jamb near the head corners of windows, in window frame openings for cranks and latches, in joints in aluminum cladding for windows, and in weatherstripping along door thresholds; discontinuous door-perimeter weatherstripping at sill corners; and door sill frames and flashing that were below the surface of waterproofing or concrete topping slabs. Pella tendered the Parkloft Claim to Liberty on July 30, 2010.

*The South Beach Claim.*[17] The South Beach Claim sought damages allegedly caused by Pella products to a condominium complex in Hilton Head Island, South Carolina. The Pella products at issue included Designer Series clad casement windows, clad sliding doors, and hinged doors that were manufactured in 2001. Defects noted or alleged included failure of window and door components, holes in door sills, sealant failure, and improper installation of sealant. Pella tendered the South Beach Claim to Liberty on December 8, 2005.

### C. The Parties' Prior Conduct and Arguments

As noted above, Pella tendered each of the Sample Claims to Liberty at various times between 2003 and 2010. These tender letters identified the claimants and other insurers when relevant. Liberty's claims notes for the various Sample Claims show extensive correspondence between Liberty and its subsidiary[18] and Pella regarding the status of the claims, including information about the content of various plaintiffs' allegations. In those claims notes, Liberty representatives note applicable SIRs for certain claims, often in reference to the costs incurred or expected for the claim at issue, and in isolation (that is, not in combination with the costs from any other claims). Two Liberty claims handlers, each of whom had responsibilities over some but not all of the Sample Claims, testified in depositions that Liberty applied a separate SIR to each Sample Claim. Liberty also does not dispute that Liberty's corporate representative, in her deposition, could point to no evidence that Liberty considered payments made toward one Sample Claim as satisfying the SIR for any other Sample Claim within the same policy period.

Pella and Liberty were also previously engaged in litigation before this Court (the Prior Coverage Action) regarding whether Liberty owed Pella coverage for two class action lawsuits against Pella. Liberty Mut. Ins. Co. v. Pella Corp., 4:07–cv–00508–JEG–TJS (S.D. Iowa); see also Pella Corp., 221 F.Supp.3d at 1110–11, 2016 WL 6514171, at *2 (summarizing the Prior Coverage Action). The Prior Coverage Action involved two underlying lawsuits: the Pappas Claim, at issue in the present case as well, and another class action not at issue in this case (the Saltzman Claim). The Pappas Claim involved Architect Series windows, and the Saltzman Claim involved Architect Series, Designer Series, and ProLine Series windows, all of which allegedly contained the same "latent defect." Pella argued that the Pappas Claim and the Saltzman Claim together alleged one single occurrence. Pella argued that the proper question was whether each underlying lawsuit alleged damages arising from a common defect in the Pella products at issue. Pella claimed that the Pap-

---

17. S. Beach Club Horizontal Prop. Regime v. Assoc. Constr. Consultants, Inc., No. 2004–CP–07–1872 (S.C. Ct. Common Pleas, Beaufort Cty.) (the South Beach Claim).

18. Pella engaged Helmsman Management Services LLC, a company owned by Liberty, for claims handling services.

pas and <u>Saltzman</u> Claims both alleged damages arising out of a single common defect that allowed water to penetrate the windows' aluminum cladding, allowing water penetration that damaged the windows and other property. This Court found that the <u>Pappas</u> and <u>Saltzman</u> Claims alleged a single occurrence because they arose out of "the same latent defect." <u>Liberty Mut. Ins. Co. v. Pella Cop.</u>, 631 F.Supp.2d 1125, 1126 · (S.D. Iowa 2009), <u>aff'd in part and rev'd in part on other grounds</u>, 650 F.3d 1161 (8th Cir. 2011).[19]

## II. DISCUSSION

The Court shall grant summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.'" <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> (quoting <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548). A genuine issue for trial requires more than "some metaphysical doubt as to the material facts." <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### A. Whether Each Sample Claim Constitutes a Separate Occurrence

■■ As with the other motions in this case, Iowa law governs this diversity action. "In interpreting state law, [federal courts] are bound by the decisions of the state's highest court." <u>Allstate Indem. Co. v. Rice</u>, 755 F.3d 621, 623 (8th Cir. 2014) (citation omitted). Iowa's general "rules governing the construction and interpretation of insurance policies are well-settled." <u>Amish Connection, Inc. v. State Farm Fire & Cas. Co.</u>, 861 N.W.2d 230, 236 (Iowa 2015). The cardinal rule is that the "intent of the parties at the time the policy was sold must control." <u>Id.</u> (quoting <u>Lemars Mut. Ins. Co. v. Joffer</u>, 574 N.W.2d 303, 307 (Iowa 1998)).

■■ Iowa courts distinguish between interpretation and construction of insurance policies. <u>Boelman v. Grinnell Mut. Reinsurance Co.</u>, 826 N.W.2d 494, 501 (Iowa 2013). Interpretation involves giving meaning to the words of the policy. "Policy interpretation is always an issue for the court, unless [the court is] required to rely upon extrinsic evidence or choose between reasonable inferences from extrinsic evidence." <u>Id.</u> Iowa courts give undefined words in an insurance policy their ordinary meaning. "The plain meaning of the insur-

---

**19.** The Eighth Circuit's opinion does not reach the question of the number of occurrences presented by the <u>Pappas</u> and <u>Saltzman</u> Claims. Rather, the Eighth Circuit held that the <u>Pappas</u> and <u>Saltzman</u> Claims did not allege property damage caused by an occurrence because they only alleged that Pella intentionally engaged in wrongful conduct.

<u>Liberty Mut.</u>, 650 F.3d at 1176. The <u>Pappas</u> Claim is at issue in this case only with regard to defense costs incurred during the period in which the <u>Pappas</u> plaintiffs alleged unintentional and negligent conduct. <u>Pella Corp.</u>, 221 F.Supp.3d at 1116–18, 2016 WL 6514171, at *7–8.

ance contract generally prevails." Id. Iowa courts will not interpret an insurance policy to render any part superfluous, unless doing so is reasonable and necessary to preserve the structure and format of the provision. Id. at 502.

 Construction of an insurance policy involves giving legal effect to the contract, which is always a matter of law for the court. Id. at 501. Courts are to determine the intent of the parties by "looking at what the policy itself says." Id. Of signal importance herein, when read as a whole, a policy is ambiguous if the language is "susceptible to two reasonable interpretations." Id. However, a policy is not ambiguous simply because the parties disagree on its meaning or it could have been worded more precisely. Amish Connection, 861 N.W.2d at 236. "If the policy is ambiguous, [Iowa courts] adopt the construction most favorable to the insured," because insurance policies are adhesion contracts. Boelman, 826 N.W.2d at 502.

There is little, if any Iowa case law regarding how to ascertain the number of occurrences alleged within or among underlying lawsuits. See Liberty Mut., 631 F.Supp.2d at 1135. "The majority of courts, however, appear to answer this question based on the 'underlying cause' of the property damage alleged." Id. (quoting Chemstar, Inc. v. Liberty Mut. Ins. Co., 797 F.Supp. 1541, 1546 (C.D. Cal. 1992)); see also U.E. Tex. One–Barrington, Ltd. v. Gen. Star Indem. Co., 332 F.3d 274, 277 (5th Cir. 2003) ("Under Texas law, 'the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects.'" (quoting Ran–Nan Inc. v. Gen. Accident Ins. Co., 252 F.3d 738, 740 (5th Cir. 2001) (per curiam))); Mich. Chem. Corp. v. Am.

Home Assur. Co., 728 F.2d 374, 379 (6th Cir. 1984) ("[T]he number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims."); Owens–Ill., Inc. v. Aetna Cas. & Sur. Co., 597 F.Supp. 1515, 1527 (D.D.C. 1984) ("[T]he policies' definition of occurrence and unifying definitional provisions focus on the cause of injury. Therefore, the Court's inquiry is whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage."); Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd., 223 Ill.2d 407, 307 Ill.Dec. 626, 860 N.E.2d 280, 287–88 (2006) ("Under the cause theory ... the number of occurrences is determined by referring to the cause or causes of the damages.... [T]he cause theory represents the law of Illinois.").

 The parties agree that the Court should determine the number of occurrences with reference to the underlying cause(s) of covered property damage but disagree regarding the level of generality at which that concept should be applied. Pella argues that each Sample Claim should be considered to allege one occurrence as a matter of law because each Sample Claim presents unique underlying circumstances. For example, Pella distinguishes between claims based on defective center pivoting designs, leaks in window cranks and latches, defective sealant, and improper installation of windows—all alleged in different Sample Claims. According to Pella, these are all separate and distinct causes of different injuries and damage and thus each Sample Claim constitutes its own occurrence.

Liberty argues that the Court should view the concept of the underlying cause at

a higher level of generality. In particular, Liberty highlights language within the definition of "occurrence," which states than an "occurrence" includes "continuous or repeated exposure to the same general harmful conditions." Pella App. 613. Liberty argues that there are either three or four sets of general alleged causes of damage: the fall through the window in the Padovano Claim, improper window installation as set forth in the Kaslly Claim, and defective windows, which encompasses the bulk of the allegations within the Sample Claims. Liberty also allows that the final category, defective windows, could be subdivided into allegations of defectively designed or manufactured windows and defective glazing or sealant. Liberty argues that this approach would be most consistent with this Court's holding on number of occurrences presented by the Pappas and Saltzman Claims in the Prior Coverage Action (one) and that Liberty's classifications represent the general types of defects or causes of damage.

▮▮▮ The Court begins its analysis with the language of the policies. As stated above, the definition of "occurrence" reads: " 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Pella App. 613. Pella does not argue that this text provides any guidance regarding the level of generality that defines the parameters of an occurrence. Liberty argues that the "substantially the same general harmful conditions" language dictates that the scope of "occurrence" be understood to be broad, such that various instances of damage-causing water intrusion in different times and places constitute "substantially the same general harmful conditions." But the "substantially the same general harmful conditions" language

within the definition of "occurrence" highlighted by Liberty primarily serves a different function. This language merely communicates the notion that accidents based on the accretion of small exposures to damage-causing conditions (that remain generally the same over time) can constitute an occurrence, even if the individual exposures may not, in isolation, suffice to cause the damage covered by the policy. Unintended water intrusion through a window, over a period of time but in a single location, provides a good example of this type of occurrence. This language thus clarifies that the CGL Policies do not consider each individual instance of water intrusion (i.e., each time a window leaks during rainfall) to be separate occurrences. This language does not address whether unintended water intrusion in different places, happening at different times, and caused by defects in different products constitutes a single occurrence just because the damage-causing instances are of the same type or can be described in the same manner.

Although Pella and Liberty each argue that their interpretations are the correct ones, the Court is ultimately compelled to find that the CGL Policies are ambiguous in this respect, meaning that the Policies are subject to multiple reasonable interpretations when interpreting the Policies as a whole. See Boelman, 826 N.W.2d at 501. While Liberty's preferred approach lacks clear support in the language of the policies, the "30,000-foot" view of an occurrence—whereby accidents of the same general *type* arising in different settings are considered a single occurrence—is also not clearly foreclosed by the text of the CGL Policies. This approach has support in the caselaw, albeit involving different facts. In Liberty Mutual Insurance Co. v. Treesdale, Inc., 418 F.3d 330, 337–39 (3d

Cir. 2005), for example, the Third Circuit, interpreting a policy containing a similar definition of "occurrence," upheld a district court's determination that numerous underlying claims for damages based on exposure to asbestos constituted one occurrence. Accord Chemstar, 797 F.Supp. at 1547–48 (finding one occurrence caused damages in 28 underlying claims all based on an identical failure-to-warn theory). And of course, this Court previously ruled in the Prior Coverage Action that the Pappas and Saltzman claims, which concerned the "same latent defect," arose out of the same occurrence. Liberty Mut., 631 F.Supp.2d at 1126. On the other hand, while the Sample Claims all alleged water intrusion that caused damage, the underlying lawsuits do not allege the "same latent defect" or "a common source." See Treesdale, 418 F.3d at 336. Rather, the Sample Claims involve a litany of different Pella products that allegedly failed for various reasons, including defective design, defective manufacturing, defective product materials such as sealants, and improper installation. Liberty goes no further than to provide a few possible taxonomic groupings of causes of water damage and fails provide persuasive support in favor of any individual "30,000" foot classification scheme. Liberty's proposed view of the number of occurrences here is reasonable but not compelled by the text of the Policies or by any applicable case law.

Meanwhile, courts have also found multiple occurrences where damage caused by the same type of accident happened for different reasons. In American Red Cross v. Travelers Indemnity Co. of Rhode Island, 816 F.Supp. 755, 761 (D.D.C. 1993), multiple instances of a damage-causing accident—distribution of HIV–contaminated blood—constituted multiple occurrences because the accidents happened for a number of different reasons. Similarly, in Nicor, claims arising from 195 mercury spills that "had no common cause" presented 195 separate occurrences. Nicor, 307 Ill.Dec. 626, 860 N.E.2d at 295–96. As in these cases, the Sample Claims allege property damage not arising from the "same latent defect" as in the Prior Coverage Actions, but from varying circumstances. To the extent Pella's theory is flawed it is not because, as Liberty argues, Pella fails to present the "underlying causes" of the Sample Claims at a sufficiently high level of generality, but instead because each of the Sample Claims themselves arguably present numerous causes of water intrusion, which would suggest that a single Sample Claim might involve more than one occurrence. As the allegations recited above show, many of the Sample Claims involve numerous Pella products and varied theories of damage.

Nevertheless, Pella's position, like Liberty's, is reasonable. While some Sample Claims themselves might involve multiple products, which could theoretically have caused water damage in different ways, there is little to no indication that subdividing any individual Sample Claim into multiple occurrences accords with the intent of the parties to the CGL Policies. That neither party here argues that any individual Sample Claim presents more than one occurrence is persuasive evidence that the intent of the parties was not to define the unit of an "occurrence" so narrowly. See Amish Connection, 861 N.W.2d at 236 ("The cardinal principle ... is that the intent of the parties at the time the policy was sold must control." (quoting Le Mars Mut., 574 N.W.2d at 307)). Because both parties proffer reasonable interpretations of the CGL Policies regarding the proper scope of an "occurrence," this Court is compelled to adopt Pella's con-

struction. The Court finds that each Sample Claim presents one "occurrence." <u>See</u> <u>Boelman</u>, 826 N.W.2d at 501–02.

## B. Estoppel

■ Because the Court adopts Pella's construction of the CGL Policies that each Sample Claim presents a separate occurrence, this Court need not address Pella's argument that Liberty should be estopped from arguing otherwise based on statements made when processing the claims. Liberty, however, argues that Pella should be judicially estopped from advocating *its* position based on the position Pella took during the Prior Coverage Action.

■ Judicial estoppel is a " 'commonsense doctrine' that 'prohibits a party who has successfully and unequivocally asserted a position in one proceeding from asserting an inconsistent position in a subsequent proceeding.' " <u>Tyson Foods, Inc. v.</u> <u>Hedlund</u>, 740 N.W.2d 192, 196 (Iowa 2007) (quoting <u>Vennerberg Farms, Inc. v. IGF</u> <u>Ins. Co.</u>, 405 N.W.2d 810, 814 (Iowa 1987)). "The doctrine is designed to protect the integrity of the judicial process by preventing intentional inconsistency. It addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another, thereby creating the perception that at least one court has been misled." <u>Vennerberg Farms</u>, 405 N.W.2d at 814.

Pella's argument on this Motion is not actually *inconsistent* with its argument in the Prior Coverage Action because the underlying facts are different. Pella previously argued that the <u>Pappas</u> Claim and the <u>Saltzman</u> Claim arose from the same occurrence because both claims alleged the same single underlying defect as the cause of the alleged damage. Liberty Mut. App. to Opp. Br. 34, ECF No. 179–2 ("The

Underlying Lawsuits allege damages arising out of a common defect in Pella aluminum clad windows, *i.e.*, that these windows all have a defect that allows water to penetrate the aluminum cladding and cause damage . . . . The Saltzman plaintiffs specifically allege that all three series contain the same latent defect. . . . The Pappas Lawsuit alleges damages resulting from a common design and manufacturing defect."). The <u>Saltzman</u> Claim is not at issue in this Motion, and Pella continues to argue that the <u>Pappas</u> Claim states one occurrence. Pella made no arguments in the Prior Coverage Action about whether the <u>Pappas</u> Claim and, for example, the <u>464</u> <u>Prospect</u> Claim constitute one occurrence or more than one. Accordingly, the Court finds that judicial estoppel presents no bar to Pella's current argument.

## III. CONCLUSION

Based on the foregoing, Pella's Motion for Partial Summary Judgment, ECF No. 171, must be **granted**.

**IT IS SO ORDERED.**